Norman A. SMITH, Appellant,

v.

EXECUTIVE CLUB, LTD. and District of Columbia, Appellees.

No. 80–758.

District of Columbia Court of Appeals.

Argued April 1, 1982.

Decided Feb. 16, 1983.

Lawrence S. Lapidus, Washington, D.C., with whom Lawrence J. Sherman and Robert J. Sher, Washington, D.C., were on the brief, for appellant.

Joel M. Finkelstein, Washington, D.C., with whom Gary A. Stein, Washington, D.C., was on the brief, for appellee Executive Club.

William J. Earl, Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, and Charles L. Reischel, Asst. Corp. Counsel, Washington, D.C., were on the brief, for appellee District of Columbia.

Before NEWMAN, Chief Judge, and KERN and FERREN, Associate Judges.

KERN, Associate Judge:

Going to a party can sometimes be a trial. In this case, appellant's attendance at a party in a downtown bar and restaurant has resulted in three separate trials for him. The origin of litigation was an altercation which occurred in February 1976 when appellant and a group of friends he joined to celebrate the occasion of a tax refund apparently attempted to leave appellee's restaurant without paying the bar bill.[1] Upon moving toward the door to leave with the group, appellant was "grabbed" from behind by an unidentified person and, in twisting to get away, fell backward onto this person. This individual turned out to be a District of Columbia police officer.

At this point, the manager of appellee restaurant responded to what he believed to be a police officer in distress and pulled appellant up from the floor and held him in a choke hold for approximately 20 to 30 seconds. The police officer told the manager to release appellant, who was then arrested for disorderly conduct. Appellant and a co-worker in attendance at the party who had also been arrested were handcuffed and taken outside to the sidewalk where they waited to be placed in a police cruiser.[2] Appellant and his co-worker were subsequently taken to the Second District Police Headquarters. Appellant was released later that night, having been held in custody for two to three and one-half hours.

Appellant brought suit seeking damages against appellee restaurant for assault and battery by its manager, who was also a part-owner, and against appellee District of Columbia for false arrest and assault and battery by a police officer. The case went to trial on three separate occasions, once ending in a mistrial and twice resulting in verdicts for appellant but with strikingly different damage awards. The first trial resulted in a verdict for appellant against appellee restaurant on the assault and battery claim and a jury award of $25,000 compensatory damages and $35,000 punitive damages to appellant. The jury also returned a verdict for appellant against appellee the District of Columbia on the false

---

1. Appellant had joined his friends after they had been celebrating for over two hours. Appellant ordered two drinks and immediately paid for them. Shortly thereafter, the group was asked to leave, and it was at this point that the manager stopped the group at the door to collect the bar bill theretofore incurred.

2. At this point, a restaurant employee brought the bar check out to appellant's co-worker who had admitted that the group's bill had never been paid. The co-worker was led inside and the restaurant was paid.

arrest claim in the amount of $25,000 for compensatory damages.[3]

Both appellees moved for judgment notwithstanding the verdict, a new trial or for remittitur. On May 14, 1979, the trial court granted the defense motions for new trial on the ground, among others, that the verdict was unconscionable and denied their motions for judgment notwithstanding the verdict and remittitur. A second trial began on October 22, 1979, but ended in a mistrial on the following day.

A third trial again resulted in a verdict for appellant against both appellees. However, the damages awarded by the jury against appellee restaurant were $500 compensatory damages and $1,500 punitive damages on the assault and battery count. Further, the jury awarded no damages whatsoever against the District of Columbia on the false arrest count, although the verdict was entered in appellant's favor.

Appellant raises several challenges to these trial proceedings on appeal. As to the first trial, appellant claims that the trial court, in ordering a new trial, erroneously set aside the jury verdict in appellant's favor and urges that we reinstate the original jury verdict. Regarding the third trial, appellant alleges that the trial court erred in denying his motion for new trial based upon several contentions.

We conclude that the trial court, following the first trial, properly granted appellees' motion for new trial, and, therefore, we decline to reinstate the original jury verdict. However, we further conclude that the trial court committed reversible error during the third trial in admitting highly prejudicial and wholly collateral testimony against appellant, and thus find it necessary to remand for a new trial as to both appellees. It is unfortunate that this case must have yet another trial in light of its drawn out litigation history, but we find this to be the only adequate remedy which will ensure a fair and accurate jury verdict

to both parties untainted by the harmful and inadmissible collateral evidence introduced during the third trial.

## I.

In an opinion dated May 14, 1979, the first trial judge set aside the jury verdict in appellant's favor and granted appellees' motion for new trial on three separate grounds. First, as to appellee restaurant, the trial court concluded that it had erroneously submitted the issue of punitive damages to the jury, since appellant had failed to offer sufficient evidence "regarding participation in, authorization of, or ratification of the conduct of the corporation [restaurant]," and that "the jury had to speculate" on this point, *citing Franklin Investment Co., Inc. v. Smith,* D.C.App., 383 A.2d 355 (1978); and *Woodward v. City Stores Co.,* D.C.App., 334 A.2d 189 (1975). (Record at 352.) Further, addressing punitive damages, the trial court stated that: "Whether the conduct of [the manager] was intentional, malicious, or willful under the circumstances of the altercation which resulted in the charge of assault and battery did not have a sufficient evidentiary base as well." *Id.*

Second, as to appellee District of Columbia, the trial court ruled that at trial it had erroneously denied the District's motion for a mistrial after appellant's counsel, during opening statement, mentioned that the disorderly conduct charge against appellant had been "dropped" by the government. There was a conference at the bench over this statement, and the trial judge, after argument by counsel, denied the District's motion for mistrial. However, in the post-trial order granting both appellees a new trial on all issues, the trial court stated:

The jury could well have believed that the dropping of the charge was evidence of lack of probable cause notwithstanding a minimal portion of the instructions to

---

**3.** The District of Columbia's motions for directed verdict on the claim of assault and battery had been granted earlier. Further, appellant

did not seek punitive damages against the District of Columbia.

**36**

the contrary. Moreover, plaintiff's arguments that no testimony was adduced on the disposition of the charge, that the jury would not have been able to split its verdict, or that the jury would conclude that a suit for false arrest would in all likelihood not have been initiated had plaintiff been convicted of the charges are not well founded. Indeed, such an inflammatory statement, which could not have been admitted into evidence by plaintiff, could cause a jury, simply because of a lack of evidence on the issue, to conclude that there was no defense and defendant was thereby responsible. (Record at 352–53.)

Finally, and in our view most persuasively, the trial court based its order granting a new trial upon the finding that "the damages awarded by the jury in this case, based on the evidence, are shocking. Each award appears to be punitive in nature ... the verdicts are clearly contrary to the weight of the evidence and must result from sympathy, passion, prejudice, or some other improper reason." (Record at 353.) The court had earlier cited *Wingfield v. Peoples Drug Store, Inc.,* D.C.App., 379 A.2d 685 (1977); and *Cox v. Pennsylvania R.R. Co.,* D.C.Mun. App., 120 A.2d 214 (1956), to support this ruling. Appellant now claims that the trial court erred in several respects in setting aside the jury verdict and ordering a new trial as to both appellees on all issues.

The decision to grant or deny a motion for a new trial is a matter within the discretion of the trial judge and is subject to reversal only for abuse. *Murville v. Murville,* D.C.App., 433 A.2d 1106, 1110 (1980); *Desmond v. Robertson,* D.C.App., 211 A.2d 775 (1965); *accord, Jacobs v. Goodspeed,* 180 Conn. 415, 429 A.2d 915 (Conn. 1980). After examining the trial court's rationale in setting aside the jury verdict and ordering a new trial, we conclude that the trial court did not abuse its discretion in granting a new trial to each appellee on all issues.

Initially, we disagree with the trial court's ruling that appellant had failed to offer sufficient evidence regarding participation in, or ratification of, the manager-owner's action by the corporation to justify the submission of the issue of punitive damages to the jury. *Franklin Investment Co., Inc., v. Smith, supra* at 358–59. This is not a case in which a security officer employed by a defendant corporation has assaulted a customer during an arrest, and the question becomes one of whether the defendant corporation ratified the employee-security officer's actions. *Woodward v. City Stores, supra* at 191. Here, the portion of the record supplied by appellant establishes that the restaurant manager was also 50% owner of the restaurant. (Supp. Record at 11–12.) This is a sufficient showing to meet the first requirement if the question of punitive damages is to reach the jury.

However, we conclude that the trial court did not abuse its discretion in finding that appellant had failed to satisfy the second condition necessary to a plaintiff's recovery of punitive damages against a defendant corporation; *i.e.,* presenting evidence of actual malice, wanton conduct, or deliberate violence on the part of appellee's manager-owner. *Franklin Investment Co. v. Smith, supra; Wanis v. Zwennes,* D.C. App., 364 A.2d 1193 (1976). In addition, we point out that appellant has failed to provide us with an adequate record to fully evaluate his claim that there was ample evidence supporting the jury verdict, in contrast to the trial court's findings that the verdicts were contrary to the evidence, since we were not supplied with the entire transcript of the first trial proceeding. *Gomez v. Gomez,* D.C.App., 341 A.2d 423, 427 (1975).

The trial court stated that it was setting aside the jury verdict and granting a new trial based upon the excessiveness of the damage awards in this case. *Hines v. Safeway Stores, Inc.,* D.C.App., 379 A.2d 1174, 1176 (1978); *Spar v. Obwoya,* D.C. App., 369 A.2d 173 (1977); *accord Yammarino v. Cranston Tennis Club, Inc.,* 416 A.2d 698 (R.I.1980). Appellant presented no hos-

pital records, hospital bills or doctor's bills supporting his damage claims. In addition, he presented no evidence of loss of earnings, future medical expenses or permanent injury or disability. In light of this, and in the absence of the record of the trial, we cannot say that the trial judge abused her discretion in finding that the jury verdict as to all aspects of damages indicated prejudice, passion, or partiality, or that it must have been based on oversight, mistake or considerations of an improper element. *Spar v. Obwoya, supra* at 180. *See Crispin v. City of Rochester,* 36 A.D.2d 684, 319 N.Y.S.2d 478 (1971) (award of $10,000 as compensatory damages for false arrest was grossly excessive where plaintiff was arrested on July 4, taken to a hospital under police guard until July 6, and was then returned to the police station for a short time); *City of Miami v. Graham,* 311 So.2d 697 (Fla.App.1975); *see generally Lacy v. District of Columbia,* D.C.App., 408 A.2d 985 (1979) (assault and battery); *Johnson v. Jackson,* D.C.Mun.App., 178 A.2d 327 (1962) (assault); *Padilla v. Spectorman,* 159 Ga. App. 12, 282 S.E.2d 659 (1981).

Because we conclude that the trial court did not abuse its discretion in setting aside the jury verdict and awarding both appellees a new trial on all issues, we find it inappropriate to reinstate the original jury verdict resulting from the first trial.[4]

## II.

Turning to the third trial, which also resulted in a jury verdict in appellant's favor as against both appellees, we conclude that the trial judge erroneously permitted appellees to introduce highly prejudicial evidence that could only confuse the jury by necessarily expanding its focus beyond the very narrow issue of possible mitigation of damages to which such evidence was solely addressed.

During cross-examination of appellant at the close of the first day of trial, counsel for appellee restaurant questioned appellant as to whether he had been convicted of assault in September of 1976, which was after the arrest in February 1976 that underlies the instant litigation. In response to objection by appellant's counsel, the trial court stated that, if there had been an arrest in connection with the September conviction, the jury could consider it "in terms of appreciating whether this was the first time [in February 1976] that he was locked up." (Record at 107.) At this point, all counsel approached the bench to discuss the use of this assault conviction in September 1976.

At the bench conference, appellee's counsel indicated that he intended to go into the "entire incident, all the underlying circumstances." (Record at 108.) Appellant had been involved in an August 1976 incident during which his wife had suffered three broken ribs and a punctured liver. Upon hearing this proffer, the trial court expressed "reservations" about the admissibility of the evidence, but delayed any further action until the following day.

The next day, appellee's counsel continued cross-examination of appellant, asking him whether he had left his wife in April 1976 and whether he had a short temper. As a final question, appellee's counsel asked appellant, in reference to the incident with his wife, whether he had been convicted of assault in Maryland in the fall of 1976.

4. We are aware that the trial judge, in ruling that the District was entitled to a new trial, also relied upon the fact that appellant's counsel on opening statement had mentioned that the disorderly conduct charge upon which appellant had been arrested after the altercation at the party was never prosecuted. There are appeals currently pending in this court which present for our decision whether it is proper for the jury to hear about the disposition of the charge upon which the arrest was based in a false arrest civil case. *District of Columbia, et al. v. Gandy,* 454 A.2d 328, to be reheard on February 22, 1983, and *District of Columbia v. Colston,* No. 81–993, heard on September 22, 1982. Since in our view the trial court correctly granted the District a new trial on the ground that the verdict at the first trial was "clearly contrary to the weight of the evidence and must result from sympathy, passion, prejudice, or some other improper reason" (Record at 353), we have no need to determine the correctness *vel non* of this aspect of the trial court's ruling.

Appellant answered that he had received a one-year sentence and that he had spent ten and one-half months in jail.

The trial court then gave a cautionary instruction to the jury indicating that the last piece of evidence concerning the jail sentence had come in on the question of damages incurred as a result of the alleged false arrest, if the jury were to reach that issue. The trial judge further stressed that the evidence was not to be considered in determining who had been the aggressor in the February 1976 altercation in the restaurant or whether appellant was entitled to recover. (Record at 116.)

On redirect examination, appellant testified that he and his wife had an altercation because "she wasn't taking care of the kids." He also stated that he had hit her in the face in self-defense after she had first hit him with a baseball bat, and that she had fallen against a table, thereby causing her injuries. He further testified that he did not strike her at any other time, and that he had gone to a local hospital to be treated for the injury he had received during the altercation.[5] Appellant finally testified that he had been charged with assaulting his wife, and he admitted that he "pled guilty because [he] did hit her." (Record at 136.) The entire redirect examination on this matter consumed a bit more than two pages of the trial transcript and appellees did not object to appellant's explanation of his September conviction extracted from him on cross-examination.

At the conclusion of redirect examination, all counsel approached the bench. Appellee restaurant's counsel indicated that he was going to question appellant on recross-examination concerning the entire incident preceding his conviction for assault of his wife in September of 1976, including the introduction of the wife's medical records to illustrate the extent of her injuries. Appellant's counsel objected, but the trial court ruled that appellant was subject to recross-

examination on this matter, since appellant during redirect had "opened the door" on the circumstances of the incident and had attempted to show that the wife was the aggressor. (Record at 139–40.) The trial court further ruled that appellee's counsel would be allowed to question appellant as to circumstances of the plea, since appellant had testified that he pled guilty to assault, while appellee's counsel contended that the actual charge against appellant was assault with intent to commit murder. The trial court stated: "[Appellant's counsel] left the impression that [appellant] was just coming clean; he did it, and he pled guilty to it. [Appellee's counsel] can show that he did it in order to avoid more serious charges." (Record at 140.)

Here, the classic example of a "trial within the trial" began, and appellant was questioned at length (some eight pages of the trial transcript) concerning the assault upon his wife in August of 1976, nearly seven months *after* the incident at the restaurant. During this questioning, appellant was asked whether he "severely injured [his] wife in that [he] fractured three of her ribs and punctured her liver, and she spent a good deal of time in intensive care as a result of the assault." (Record at 143.) Appellant also testified that, while the charge entered against him was assault with intent to commit murder, he entered a guilty plea only to assault and battery because he "had no intent to commit murder, [i]t was a defensive mechanism." (Record at 144.)

Appellee restaurant then was allowed by the trial court to call Dr. Massimo Righini to the stand. Dr. Righini's direct testimony consumed over 16 pages of the trial transcript. This doctor testified during direct examination that he had treated appellant's wife for the injuries she received as a result of appellant's assault upon her in August 1976. Dr. Righini testified that he had treated patients for "traumatic injuries,"

---

**5.** Appellant's counsel then asked appellant to identify his emergency room treatment record

dated August 11, 1976 from Hadley Hospital.

and that he first saw appellant's wife on August 22, 1976, when she was admitted to the hospital.[6] The doctor described the results of his examination of Mrs. Smith in great detail, including a description that she "had an injury to the face . . . four fractured ribs on the left side . . . multiple fractures on each rib, at least two points of break." (Record at 153.) The doctor went on to describe the injuries to appellant's wife which were later discovered during surgery:

> The main injury which caused the surgery to be performed was an injury to the liver. The liver had several areas of bleeding in the substance of the liver, what we call a hemotoma, particularly severe in the line that goes between the right and left half, or lobe, of the liver at which point the blood had collected so much that it ruptured the sheath of the liver, the capsule of liver, and that started leaking into the abdominal cavity. She had, according to my notes, six to eight hundred cubic centimeters of blood in the abdominal cavity. That would be about a pint and a half approximately. . . . This would not take into account the blood collected in the liver substance itself, which was clotted; so it was a rather large amount already there. The

expansion of this blood clot had caused the gall bladder to detach itself from the liver and become loose in the abdominal cavity, and that had to be removed because there were definitely problems with the blood supply to the gall bladder. (Record at 155–56.)

When questioned concerning his opinion as to the cause of this "severe trauma," the doctor testified that this was comparable to the "type of injury you see in a high-speed vehicular accident, hitting a wall in your car at 30, 40 miles an hour without a seatbelt on, and being thrown into the steering wheel is the kind of accident that would cause similar injuries." (Record at 159.) The doctor was "almost absolutely certain" that such injuries to appellant's wife could not have resulted from one fall from an upright position to the ground.[7]

This entire line of testimony was admitted on the basis of challenging appellant's credibility regarding the circumstances of the August 1976 assault upon his wife. We again point out that the fact of appellant's conviction for assault in September 1976 had been originally permitted to come into evidence during cross-examination solely on the issue of the mitigation of damages re-

---

6. While appellant's hospital record was dated August 11, 1976, and his recross-examination and Dr. Righini's testimony addressed an incident of August 22, 1976, neither counsel addressed this discrepancy. We assume that there was one altercation between appellant and his wife which resulted in injuries to appellant as well as to appellant's wife and which resulted in appellant's conviction for assault in September 1976 and subsequent detention. If anything, this confusion of date may have left the impression with the jury that appellant was an habitual wife-abuser and that only the most serious assault resulted in a conviction for assault.

7. The trial judge went on to ask whether it would have taken multiple contacts to deliver these injuries if there was not a single contact force of the magnitude of 30 to 40 miles per hour. Dr. Righini responded:

> Well, you see, if you are talking about multiple contacts, and in this particular context we are talking about fist blows or kicks or whatever can be delivered with a body part, then we are talking about a concentration of

energy. The reason for which a fist blow can cause severe damage is that it is concentrated in a few square inches. And if you apply the entire weight of, let's say, a 180-pound person over an area of four or five, six inches, you have a pretty high per square inch impact; so you are delivering all that energy in a limited area and you can cause serious damage. So you could have one severe blow to the rib cage of sufficient intensity to cause fracture to the ribs; then you have to go to the other side and have a blow to the liver area of sufficient intensity to cause damage to that; and then a blow to the face of sufficient intensity to fracture the bones of the nose, and so forth. Then it's much more easy to conceive of. (Record at 161.)

The doctor concluded his testimony by stating that the mathematical odds that a single blow in a simple fall situation could cause such severe injuries were "one out of a hundred." (Record at 163.)

sulting from appellant's false arrest in February of 1976.

■ During the two full trial proceedings, appellant had testified that he suffered various injuries as a result of two "separate assaults" at the restaurant. He also testified that he was angry and upset and subsequently suffered mental stress at his job. Finally, he claimed that this incident in February 1976 affected adversely his job performance thereafter. In an action for false imprisonment, we recognize that matters not otherwise admissible may be competent in mitigation of damages, such as evidence of previous arrests and time spent in jail, where the plaintiff claims in his suit that he was humiliated and upset by the alleged false arrest. 35 C.J.S. *False Imprisonment* § 56(h); *Nichols v. Woodward & Lothrop, Inc.,* D.C.App., 322 A.2d 283, 286 (1974); *Allen v. Vogue Amusement Co.,* 377 S.W.2d 805 (Ky.1964).

■ We also agree that, in some instances, character is an issue in a false arrest action where the plaintiff claims compensatory damages for emotional distress, and in such a case evidence as to the plaintiff's character may be admitted. *Bean v. Best,* 77 S.D. 433, 93 N.W.2d 403 (1958). However, we must also recognize that evidence, although relevant, should nevertheless be excluded by reason of the general principle that the usefulness of the evidence is more than counter-balanced by its disadvantageous effects in confusing the issues before the jury, or in creating an undue prejudice in excess of its legitimate probative weight. *Whistler Sportswear, Inc. v. Rullo,* 289 Pa.Super. 230, 433 A.2d 40 (Pa.Super.Ct.1981); *Terry v. Zions Cooperative Mercantile Institution,* 605 P.2d 314, 322 (Utah 1979); 6 J. WIGMORE, *Evidence,* § 1904 (Chadbourn rev. 1976); C. McCORMICK, *On Evidence,* § 185 (2d ed. 1972).

■ Appellees here were allowed on cross-examination to introduce evidence of appellant's conviction of assault in September 1976 subsequent to his arrest in February 1976, as affecting the issue of damages from such alleged false arrest. Upon a careful consideration of the chronology of events in this case, we are of opinion that the trial court's initial admission of the subsequent assault conviction of September 1976 in mitigation of damages may have been improper, although not amounting to reversible error.

We note initially that appellee apparently introduced the September 1976 assault as the "cut-off" point beyond which date appellant could no longer claim damages for any mental stress resulting from his arrest in February 1976.[8] Under these circumstances, the trial court then properly limited the initial cross-examination to the fact of appellant's conviction and subsequent detention in September 1976 for assault as it impacted upon damages flowing from the February 1976 false arrest claim. The instruction by the court regarding the limited use of this evidence given immediately after cross-examination was necessary and proper to prevent prejudice to appellant.[9]

**8.** In *Allen v. Vogue Amusement Co.,* 377 S.W.2d 805, 807 (Ky.1964), counsel was permitted to question plaintiff's witnesses regarding an event resulting in detention which occurred *after* the event upon which plaintiff's action for false imprisonment was based. These questions were permitted as bearing upon the alleged emotional effects claimed to have been suffered by the plaintiff from the original incident of detention. *See Anderson v. Foster,* 73 Idaho 340, 252 P.2d 199 (Idaho 1953); *McCullough v. Greenfield,* 133 Mich. 463, 95 N.W. 532 (1903). If an arrest was illegal because made before the issuance of a warrant, the plaintiff can recover damages only for his detention until the time when he was turned over to an officer holding a valid warrant. 32 Am.Jur.2d *False Imprisonment* § 135 (1982).

**9.** "Evidence is unfairly prejudicial in this context if it has a tendency to influence the outcome of the trial by improper means, or if it appeals to the jury's sympathies, or arouses its sense of horror, provokes its instinct to punish or otherwise causes a jury to base its decision on something other than the established propositions of the case." *Terry v. Zions Cooperative, supra* at 323 n. 31; *citing Lease America Corp. v. Insurance Company of North America,* 88 Wis.2d 395, 276 N.W.2d 767 (1979).

However, we further note that appellant's *own testimony* established a prior cut-off point beyond which his damages became de minimis, and the proffer by appellee of the September 1976 assault was, therefore, irrelevant and arguably improper.[10] Nevertheless, because the parties failed to focus upon the temporal extent of appellant's injuries resulting from his false arrest in February, it would have been extremely difficult for the trial court to fully appreciate the purpose or impact of appellant's testimony concerning the September assault conviction. Thus, we conclude that the admission of testimony to the fact of the subsequent conviction in mitigation of damages was not reversible error, although it appeared irrelevant.

We do conclude, however, that appellees must be held responsible for introducing the highly prejudicial evidence which occurred during the "trial within the trial" after introduction of the irrelevant assault conviction of September 1976. Most significantly, we deem the highly prejudicial and detailed testimony of Dr. Righini as distracting the jury from the issue for its determination.

■ Appellant's redirect-examination, when viewed in context, was an attempt to minimize the damaging effect of the cross-examination that revealed his September conviction; but a full-fledged "mini-trial" on the severity of the assault by appellant and the extent of his wife's injuries, including testimony from the physician treating her, was simply not justified under the circumstances. Although appellant may have "opened the door" a bit wider after appellee introduced the subsequent conviction during cross-examination on the narrow issue of mitigation of damages, for false arrest, a

party cannot completely remove a door from its hinges by bringing in such highly inflammatory and prejudicial evidence as that introduced through the medical testimony of Dr. Righini describing the gory details of the wife's injuries. *See United States v. Maryland & Virginia Milk Producers Ass'n,* 20 F.R.D. 441, 442 (D.D.C.1957); *cf. City of New York v. Pullman, Inc.,* 662 F.2d 910, 915 (2d Cir.1981); and *Fury Imports, Inc. v. Shakespeare Co.,* 625 F.2d 585, 589 (5th Cir.1980), *reh. denied,* 631 F.2d 1189, *cert. denied,* 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 349 (1981) (both discussing the balancing test of Federal Rules of Evidence 401 and 403).

■ It is the trial court's function to exclude evidence that would confuse issues and distract the attention of the jury from the primary to the collateral issues. *Eldridge v. Melcher,* 226 Pa.Super. 381, 387, 313 A.2d 750, 756 (Super.Ct.1973); *accord, Peterson v. Neme,* 222 Va. 477, 281 S.E.2d 869, 872 (Va.1981); *Katsetos v. Nolan,* 170 Conn. 637, 368 A.2d 172 (Conn.1976). In *Terry v. Zions Cooperative, supra,* the Supreme Court of Utah held that the trial court properly limited the introduction of proffered evidence concerning the plaintiff's prior arrest and conviction for shoplifting during her action against a store for malicious prosecution, false arrest and false imprisonment arising from a similar incident. In addition, the court ruled that the trial court properly limited *defendant's cross-examination* of plaintiff on this incident, since cross-examination on this point to impeach plaintiff would necessitate undue consumption of time, create substantial danger of prejudice, and would confuse the issue or mislead the jury from a task at

---

10. Appellant testified that he suffered humiliation in the eyes of his fellow employees and mental stress that affected his job performance as a result of his false arrest in February. However, appellant testified that he left his job approximately six months after the false arrest in February, thus apparently precluding any further job-related humiliation and emotional distress. (Record at 41.) The conviction for assault occurred in September 1976, more than

six months after the alleged arrest. While this point, unfortunately, was not carefully explored by the parties at trial, it appears that appellant was not claiming damages resulting from the February false arrest at the time of his assault conviction in September. The admission of the subsequent assault conviction was, therefore, irrelevant to the mitigation of damages in the case.

hand. *Id.* at 325. As the court pointed out in *Terry:*

> [T]he considerations of confusion and prejudice are amplified by the fact that the prior conviction was based on a guilty plea and not a full trial on the merits ... any presentation of details from the prior incident would necessitate in essence a new trial of that incident and substantially delay the present proceeding. [*Id.* at 325.]

■ We have held on previous occasions that the regulation of the extent and scope of cross-examination lies with the discretion of a trial judge. *Rogers v. United States,* D.C.App., 419 A.2d 977, 980 (1980); *Mitchell v. United States,* D.C.App., 408 A.2d 1213, 1215 (1979). Further, we have held that the trial court "may always limit cross-examination ... to prevent inquiry into matters having little relevance or probative value to the issues raised at trial" without committing error in order to avoid a "mini trial." *Springer v. United States,* D.C.App., 388 A.2d 846, 854–55 (1978); *Singletary v. United States,* D.C.App., 383 A.2d 1064, 1073 (1978). The failure of the trial court to exercise its discretion in a manner which will prevent the introduction of collateral and highly prejudicial evidence may constitute an abuse of discretion and such was the case here. Given the highly inflammatory nature of the substantial evidence adduced we conclude the trial court failed to exercise its discretion concerning the proper scope of recross-examination. *See Rogers v. United States, supra* at 981; 29 Am. Jur.2d *Evidence* § 260 (1967).

While it is true that at the close of all testimony, the trial court instructed the jury that the medical testimony came in "solely for credibility purposes," and did not come in to show that plaintiff was the aggressor at the restaurant or that appellant was a "bad guy," (Record at 226), we conclude that this cautionary instruction was ineffective. Under the particular circumstances, such an instruction could not have cured the impact of Dr. Righini's detailed and highly prejudicial testimony concerning the extent of Mrs. Smith's injuries and his opinions as to the cause of those injuries. *See generally, Dixon v. United States,* D.C.App., 287 A.2d 89, 97–100, *cert. denied,* 407 U.S. 926, 92 S.Ct. 2474, 32 L.Ed.2d 813 (1972); *cf. United States v. Tumblin,* 551 F.2d 1001, 1004 (5th Cir.1977) (discussing F.R.E. 609).

In sum, because the parties failed to focus upon the time limits surrounding appellant's emotional suffering, we cannot say the trial court's admission of the fact of appellant's subsequent detention following his conviction for assault in September 1976 on the narrow issue of the possible mitigation of damages for unlawful arrest arising from the February 1976 incident in the restaurant was reversible error. However, once appellee restaurant was permitted, on the basis of challenging appellant's credibility, to develop the surrounding circumstances and results of this conviction through the collateral and highly prejudicial testimony of Dr. Righini, the trial court thereby allowed appellee to conduct a confusing "mini trial" on this September 1976 assault incident, which was an action identical to that appellant was presently pursuing in his civil suit against the appellees. This was an abuse of the trial court's discretion to control the flow and scope of witness examination during the course of a trial.[11]

Under the particular circumstances we conclude that the trial court abused its discretion in permitting the extended recross-examination of appellant as to the circumstances surrounding the assault conviction in September 1976 and then calling a physician to the stand to testify as to the cause

---

11. Because we find it necessary to remand this case for a new trial on all issues, we do not address appellant's additional arguments that a new trial was mandated because the jury returned a verdict of zero damages after entering a verdict in appellant's favor against the District of Columbia on the false arrest claim, *see Lester v. Dunn,* 154 U.S.App.D.C. 399, 475 F.2d 983 (1973), or that the trial court's instruction on compensatory damages was "erroneously contradictory" following the third trial.

and extent of the injuries of appellant's wife. Regretfully, we find it necessary to reverse and remand this case for yet a new trial on all issues.

*Reversed and Remanded for a new trial.*