**DISTRICT OF COLUMBIA, Appellant,**

v.

**Steven COOPER, Appellee.**

**No. 81–1193.**

District of Columbia Court of Appeals.

Argued Feb. 23, 1983.

Decided Oct. 24, 1984.

Leo N. Gorman, Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, Washington, D.C., at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, Washington, D.C., were on the brief, for appellant.

Samuel M. Shapiro, Washington, D.C., with whom Irwin G. Meiselman, Rockville, Md., was on the brief, for appellee.

Before NEWMAN, Chief Judge, and PRYOR and TERRY, Associate Judges.

TERRY, Associate Judge:

In March 1977 an unknown assailant shot Steven Cooper and a fellow inmate at Lorton Reformatory. Cooper filed suit against the District of Columbia, seeking damages for its alleged negligence and medical malpractice. A jury found for Cooper on the first claim, awarding him $25,-000, and for the District on the second. Cooper appealed from the ensuing judgment, contending that the trial court had erroneously limited the jury's consideration of evidence of psychological injury to the malpractice claim. The District agreed; we therefore vacated the judgment and remanded the case for a new trial on the issue of damages.[1] The jury at the second trial awarded Cooper $200,000, and the District now brings this appeal. Because the trial court erred both in admitting evidence of damages for which the District cannot be held liable and in keeping out other relevant evidence, we must reverse the judgment and remand once again for another new trial on the issue of damages.[2]

**I**

At the outset of the second trial, Cooper moved *in limine* for an order barring any evidence concerning his juvenile record, his adult arrest record, and the facts and circumstances surrounding his four adult convictions.[3] The District opposed the motion, announcing that it intended to introduce Cooper's juvenile delinquency adjudica-

tions, adult convictions, and prison records to rebut his evidence of psychological injuries. The District hoped to show that Cooper had been exposed to violence long before the shooting and that the psychological symptoms which he attributed to the attack actually antedated it. Additionally, the District intended to use the same records to cross-examine the psychiatrist who would be testifying for Cooper.

The trial court granted Cooper's motion, ruling that it would not allow the jury to hear any evidence of his juvenile record or his adult arrest record. It also barred any evidence of the facts underlying Cooper's adult convictions, concluding that their prejudicial effect outweighed their probative value.

Dr. Robert Dupont, a psychiatrist, testified about Cooper's alleged psychological injuries resulting from the shooting.[4] He diagnosed Cooper's condition as a reactive depression with pronounced paranoid tendencies and stated that in his opinion it did not predate the 1977 shooting. Asked to state the cause of his condition, Dr. Dupont gave a two-pronged answer. Cooper's troubled life had "set the stage" for his mental illness, he said, but the immediate cause was the shooting and its accompanying stress.[5] Before the shooting, to the best of Dr. Dupont's knowledge, Cooper had been "relatively optimistic . . . and self-confident"; after the shooting he was not.

After nine months in Lorton's maximum security unit, Cooper was transferred to the federal penitentiary at Terre Haute, Indiana. Dr. Dupont testified that Cooper

1. *Cooper v. District of Columbia,* No. 80–1209 (D.C. March 9, 1981) (unpublished order).

2. We held this appeal in abeyance pending our decision in *Morgan v. District of Columbia,* 468 A.2d 1306 (D.C.1983) (en banc). The en banc decision in *Morgan* resolved some, but not all, of the issues presented in this case.

3. Cooper, who testified in his own behalf, acknowledged that he had been convicted of armed robbery in 1972, and armed burglary, assault with intent to commit robbery, and armed robbery in 1974. He was serving time on the latter three convictions when he was shot.

4. Dr. Dupont's testimony was based upon two sessions with Cooper, in January 1980 and May 1981, and interviews with Cooper's mother and sister.

5. In recounting Cooper's history, Dr. Dupont testified that at about the age of sixteen Cooper "began a time of considerable delinquency." He was first incarcerated at the age of seventeen. By the time of trial, he had spent nine of the preceding eleven years in prison.

was unable to participate in any educational program or to obtain psychological care at Terre Haute. At that point counsel for the District objected, contending that the transfer and any psychic damage stemming from it were due not to the shooting but to the continuing threat of bodily harm to which Cooper was subjected. The court overruled the objection. Dr. Dupont then continued, stating that the transfer had drastically curtailed visits by Cooper's family. He characterized the separation from his family as "very much a part" of Cooper's psychological injury.

Dr. Dupont testified that Cooper needed "intensive and prolonged" psychotherapy. Specifically, he prescribed a year or two of inpatient care at a psychiatric hospital,[6] followed by three years of semi-weekly psychotherapy, then two years of weekly visits.[7] With ideal treatment Cooper could recover substantially, although some of his symptoms would endure. Without the treatment, the doctor said, his chances of recovery were not good.

Before the District's counsel began his cross-examination, he reiterated his desire to use the prison records in questioning Dr. Dupont. The trial court stated that its *in limine* ruling extended to these documents as well. Dr. Dupont then stated that nothing in those records contradicted his own diagnosis, nor was anything in the records inconsistent with what Cooper, his mother, and his sister had told him. When counsel for the District sought to ask Dr. Dupont about Cooper's juvenile adjudications, to which the doctor had referred on direct examination (see note 5, *supra*), the court

refused to allow the questions and adhered to its *in limine* ruling.

Cooper himself testified about the shooting, the pain and fear that ensued, and the injuries that lingered. He complained of chronic pain and of limited arm and shoulder flexibility.[8] Further, while he was once "pretty outgoing," he had become "withdrawn," "nervous," and unable to trust others since the shooting. In addition, he said, the shooting had damaged his relationships with his family and his fiancee. Over the objection of the District's counsel, Cooper also testified about matters that occurred after his transfer to Terre Haute. He stated that the transfer had drastically curtailed visits from his family and his fiancee,[9] and that the Terre Haute facility offered him less physical freedom and fewer religious and community activities than Lorton had.[10]

Dr. David Lanham, also a psychiatrist, testified on behalf of the District. His testimony was based on his examination of Cooper eleven days earlier and on a review of Cooper's institutional and medical records. Dr. Lanham's account of Cooper's history was substantially the same as Dr. Dupont's. However, when he mentioned that as a youth Cooper had had "a number of problems with the law, including time spent at [the] Children's Center," Cooper's counsel objected. The court sustained the objection and instructed the witness in accordance with the *in limine* order. Dr. Lanham pointed out that his diagnosis was partly based on Cooper's juvenile record, but the court adhered to its ruling.

---

6. Later testimony from a health care expert established that one year at a psychiatric hospital would cost well over $100,000 in 1981, and substantially more in each of the next three years.

7. Cooper's counsel asked Dr. Dupont to assume that Cooper was not incarcerated. Dr. Dupont gave no prescription which took his imprisonment into account.

8. Both parties offered medical testimony concerning the nature of Cooper's injuries.

9. In her own testimony Cooper's mother confirmed this, stating that she had not visited her son at all during his stay at Terre Haute. She also testified that in her telephone conversations with him during that time, he "just wasn't the same person"; he was "angry ... upset and disgusted."

10. Cooper did not testify directly to the psychological effect of the transfer. Although the trial court overruled the District's objection to a question on the subject, Cooper's counsel went on to a new question.

Unlike Dr. Dupont, Dr. Lanham testified that he had observed few objective signs of psychiatric problems during his interview with Cooper; furthermore, he was not convinced by Cooper's own account of his symptoms. Dr. Lanham saw nothing in Cooper that distinguished him from prisoners in general, and he found no basis for a diagnosis of a depressive or paranoid disorder. Instead, he diagnosed Cooper as having an antisocial personality. He disputed Cooper's need for the course of treatment which Dr. Dupont described, stating instead that Cooper might benefit from psychotherapy, as might "any of us in this room." Such benefit, however, would have little to do with the shooting; rather, it "would go far beyond that and go all the way back to childhood events and his whole lifestyle to the personality disorder ... that I addressed earlier."

The jury awarded Cooper $200,000. The District moved for a new trial or, alternatively, a remittitur. The trial court denied the motion, and this appeal followed. The District contends here, as it did below, that the transfer to Terre Haute was not due to the shooting, but rather to the continued danger posed to Cooper by the failure to apprehend his assailant. It argues that, as a matter of law, Cooper could not recover damages for any injury resulting from the transfer, and that the trial court therefore erred in allowing testimony on the subject. In addition, the District argues that the court erred in prohibiting Dr. Lanham from discussing Cooper's juvenile record and his adult criminal behavior, and in prohibiting its own counsel from cross-examining Dr. Dupont on the basis of Cooper's prison records. We find merit in both arguments.

## II

■ "Evidentiary rulings fall within the sound discretion of the trial judge and ordinarily do not serve as the basis for reversal absent an abuse of discretion and serious injury to the aggrieved party." *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 550 (D.C.1981) (citations omitted). Hence, although a trial court may err in admitting irrelevant evidence, we will not reverse unless that error resulted in serious prejudice to the appellant. In this case we find such prejudice. Because Cooper had no right to remain at Lorton in the first place, the District's duty of care did not extend to the protection of any interest he might have had in not being transferred. Any evidence of injuries stemming from his transfer to Terre Haute was therefore irrelevant. Because those alleged injuries formed a substantial portion of Cooper's claim for damages, the evidence of them which the jury heard was seriously prejudicial to the District. We therefore must reverse on this ground.

■ The elements of a cause of action for negligence are a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach. PROSSER, HANDBOOK OF THE LAW OF TORTS § 30 (4th ed. 1971); *see Morrison v. MacNamara*, 407 A.2d 555, 560 (D.C.1979); *Kosberg v. Washington Hospital Center, Inc.*, 129 U.S.App. D.C. 322, 324, 394 F.2d 947, 949 (1968). Implicit in this formulation is the requirement that the interest damaged be one which the law protects against unintentional injury. *See* RESTATEMENT (SECOND) OF TORTS § 281(a) (1965). Prosser views this requirement as a factor in the existence of a duty: "The statement that there is or is not a duty begs the essential question— whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." PROSSER, *supra*, at § 53 (footnote omitted). The existence of a duty of care, Prosser writes, is "essentially a question of whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred. Quite often this has been stated, and properly so, as an issue of whether the defendant is under any duty to the plaintiff, or whether his duty includes protection against such consequences." *Id.* at § 42; *see also Andrus v. Trailers Un-*

*limited,* 647 F.2d 556, 559 (5th Cir.1981) (plaintiff must establish that "the defendant's duty, whatever it may be, extends to the specific injury which the plaintiff has received") (citations omitted). Thus, in order to prevail in a negligence action, it is not enough for the plaintiff to show a causal link between the defendant's act or omission and the injury suffered. There must also be a legal link between the two. In this case there is not.

■■■ Cooper had no legally recognized interest in remaining at Lorton Reformatory. Under D.C.Code § 24–425 (1981), persons convicted of crimes in the District of Columbia are committed to the custody of the Attorney General, who may "order the transfer of any such person from one institution to another if, in his judgment, it shall be for the well-being of the prisoner or relieve overcrowding or unhealthful conditions in the institution where such prisoner is confined, or for other reasons." This authority is "clear and apparently limitless." *Curry-Bey v. Jackson,* 422 F.Supp. 926, 932 (D.D.C.1976). Obviously, as long as section 24–425 is in the Code, a District of Columbia prisoner can have no legitimate expectation that he will remain at Lorton throughout his term. Without such an expectation, a prisoner has no interest protected by the Due Process Clause from summary deprivation. *See Meachum v. Fano,* 427 U.S. 215, 225–226, 96 S.Ct. 2532, 2538–2539, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). Thus the courts have held that a District of Columbia prisoner has no due process right to a hearing before being transferred to another prison. *Smith v. Saxbe,* 183 U.S. App.D.C. 210, 216, 562 F.2d 729, 735 (1977); *Curry-Bey v. Jackson, supra,* 422 F.Supp. at 932. Since a prisoner's interest in remaining at Lorton is not even protected against intentional invasion, *a fortiori* the law will not protect it from negligent invasion.

■■■ Negligence, as we have said, is the breach of a duty owed by the defendant to the plaintiff. In this case the District's only duty to Cooper was to protect him from being shot. Its breach of that duty made it liable to him for the injuries he suffered as a result of the shooting. But the District owed Cooper no duty to keep him at Lorton, and thus it could not be liable in damages for any injuries resulting from his transfer to Terre Haute. The lack of a legal link between the District's negligence and these alleged injuries renders them uncompensable. *See Platt v. District of Columbia,* 467 A.2d 149 (D.C.1983); *Palsgraf v. Long Island R.R.,* 248 N.Y. 339, 162 N.E. 99 (1928). The jury's verdict must therefore be set aside. Reversal is required when it appears that irrelevant evidence, erroneously admitted, may have influenced the jury's verdict on a crucial factual issue—in this case, the amount of damages. *See Phillips & Sager v. Kern,* 50 App.D.C. 317, 319, 271 F. 547, 549 (1921).

### III

We also agree with the District's contention that the trial court abused its discretion in preventing Dr. Lanham from testifying about Cooper's juvenile record. The court's ruling was evidently based on the general principle, embodied in D.C.Code §§ 16–2331 and 16–2332 (1981), that records of juvenile proceedings are confidential and may not be disclosed except, in certain instances, to courts and specified government officials. *See Smith v. United States,* 392 A.2d 990, 991–993 (D.C.1978); *Brown v. United States,* 119 U.S.App.D.C. 203, 205–208, 338 F.2d 543, 545–548 (1964). But other interests may require the veil of secrecy to be lifted. For example, in *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Supreme Court held that a criminal defendant's Sixth Amendment right to confrontation entitled him to cross-examine a prosecution witness about his probationary status following an adjudication of juvenile delinquency, despite a state statute making juvenile records confi-

dential. *Accord, Lewis v. United States,* 408 A.2d 303 (D.C.1979).

■ Admittedly, the District is not in the position of a criminal defendant. It is not nearly so gravely imperiled as the defendant in *Davis v. Alaska,* and consequently it does not enjoy the same degree of constitutional protection. Even so, doctrines of fundamental fairness unquestionably guarantee it the right to introduce relevant evidence in its own behalf, and in this instance we believe that this right must prevail over the confidentiality of Cooper's juvenile records. Cooper's alleged psychological injuries were the primary element of his claim for damage. Dr. Lanham's testimony was crucial to the District's defense; if believed, it strongly supported the conclusion that Cooper suffered little or no damage from the District's negligence. Further, as Dr. Lanham plainly told the court, Cooper's juvenile record and its surrounding facts were an important factor in his diagnosis. Evidence of this record, and of the fact that Dr. Lanham took it into account, would surely justify a jury in concluding that his diagnosis was correct and that Dr. Dupont's was wrong. The probative value of this evidence was so great that it was critical to the District's right to present evidence in its own behalf. We hold, therefore, that Cooper's general statutory right to confidentiality must give way.

There are two additional reasons why the confidential nature of Cooper's juvenile records cannot prevent their admission in the instant case. Both of them stem from the purpose of keeping juvenile records confidential so as to further the rehabilitation of young offenders by relieving them of the enduring stigma of their misconduct. *See Davis v. Alaska, supra,* 415 U.S. at 319, 94 S.Ct. at 1111; *In re Gault,* 387 U.S. 1, 24, 87 S.Ct. 1428, 1441, 18 L.Ed.2d 527 (1967). That purpose is not served when, as in this case, the juvenile has persisted in crime as an adult. The revelation of Cooper's delinquency adjudications would do little or no damage to his standing in the community in light of his adult convictions for violent crime. Regrettably, he is no longer in the class of persons whom the statute is designed to protect. Further, while the confidentiality statute enables one to live free from the embarrassment of youthful transgressions, it was surely not meant to be used as an offensive weapon. Having thrown his psychological history into issue, Cooper may not invoke the statute to keep out relevant evidence which tends to contradict his claim. He cannot have it both ways.

■ Having concluded that the confidentiality statute raises no bar to the admission of evidence of Cooper's juvenile history, we must next decide whether the probative value of that evidence outweighs its prejudicial impact. *See, e.g., Smith v. Executive Club, Ltd.,* 458 A.2d 32, 40 (D.C. 1983); *see also* Fed.R.Evid. 403. It should be clear from what we have already said that the prejudicial effect of Cooper's juvenile record and his adult criminal conduct is far outweighed by its probative value. Cooper's exposure to violent crime was critical to Dr. Lanham's diagnosis, which in turn was critical to the District's defense. Cooper, it must be remembered, was not on trial here; there was no danger that he would be convicted of a crime because the jury learned that he had previously been convicted of another crime. Moreover, both his adult convictions and the fact that he had a history of juvenile delinquency were already before the jury; further evidence concerning his delinquency could have done little to lower the jury's esteem for him. We hold, therefore, that the trial court abused its discretion in keeping this evidence out.

■ Finally, we hold that the trial court also abused its discretion in preventing counsel for the District from cross-examining Dr. Dupont about a report in Cooper's prison file. Just as the District had the right to present evidence in its own behalf, so too it had the right to cross-examine Cooper's witnesses. *See, e.g., Davis v. Alaska, supra,* 415 U.S. at 316, 94 S.Ct.

at 1110; *The Ottawa,* 70 U.S. (3 Wall.) 268, 270–271, 18 L.Ed. 165 (1865). Dr. Dupont testified that he had reviewed Cooper's prison files in reaching his diagnosis and that nothing in them contradicted it. Yet part of those files is a personality evaluation done shortly after his armed robbery conviction in 1972. In it the clinical psychologist who examined Cooper found in him "considerable anxiety" and stated that he was "inclined to remain wary and aloof from any close contact . . . ." The presence of this evaluation in the prison file obviously undermines Dr. Dupont's testimony that nothing in the file contradicted his diagnosis. The jury should have been given an opportunity to learn about it, for it might well have led them to give less weight to Dr. Dupont's testimony. It would support an inference either that he had failed to inspect the file carefully and had unwittingly based his diagnosis on less than all available information, or that he was not being candid in his assessment of the evaluation.[11] Either inference, we think, would have proven significantly damaging to Dr. Dupont's testimony, which was as important to Cooper's case as Dr. Lanham's testimony was to the District's. The prejudicial impact of this evidence was slight; Dr. Dupont had already told the jury of the conviction which led to this examination and evaluation, and Cooper himself would soon do the same. Unless we are to assume that the knowledge that a party has been termed "wary and aloof" will prejudice a jury against him, we must conclude that the evaluation's probative value for impeaching Dr. Dupont far outweighed its potential for prejudice, so much so that the trial court's failure to allow its use on cross-examination was an abuse of discretion.

Since the District does not contest the finding of negligence, we affirm the judgment insofar as it establishes the District's liability. We reverse that portion of the judgment which awards $200,000 to Cooper and remand this case to the Superior Court for yet another trial on the issue of damages.

*Affirmed in part, reversed in part, and remanded.*

---

**11.** The District indicated at trial that it did not intend to introduce the evaluation to show that Cooper was in fact wary and aloof at that time, but only to impeach Dr. Dupont's testimony. Thus, even if we were to agree with Cooper's contention that the personality evaluation was inadmissible hearsay, a question which we do not address, we would nevertheless conclude that the trial court erred in barring its use on cross-examination. A party may impeach an expert witness with written documents, even though they may be hearsay as to the truth of their contents. *See* 32 C.J.S. *Evidence* § 560(1) (1964).