*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-116

DARON D. WINT, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2015-CF1-7047)

(Hon. Juliet McKenna, Trial Judge)

(Argued March 30, 2022                              Decided December 15, 2022)

*Lee R. Goebes*, Public Defender Service, with whom *Samia Fam* and *Stefanie Schneider*, Public Defender Service, were on the brief, for appellant.

*Nicholas P. Coleman*, Assistant United States Attorney, with whom *Channing D. Phillips*, Acting United States Attorney, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, and *Laura Bach*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, EASTERLY, *Associate Judge*, and FISHER, *Senior Judge*.

Opinion for the court by *Chief Judge* BLACKBURNE-RIGSBY.

Opinion by *Associate Judge* EASTERLY, concurring in part and dissenting in part, at page 30.

BLACKBURNE-RIGSBY, *Chief Judge*: This appeal stems from a brutal quadruple homicide, in which three family members and their housekeeper were kidnapped, held hostage over the course of two days, extorted for cash, and tortured. Firefighters ultimately found part of the family's home engulfed in flames and all four victims' bodies burned.

In 2016, appellant was indicted on four counts of first-degree murder while armed (D.C. Code §§ 22-2101, -4502), and related charges.[1] At trial, appellant presented a third-party perpetrator defense, arguing that his two brothers, Darrell Wint and Steffon Wint, were the actual perpetrators. During its rebuttal case, the government introduced evidence that Darrell Wint was outside the District of Columbia for part of the day when the crimes occurred. Appellant moved for surrebuttal, proffering evidence that would purportedly contradict Darrell's alleged whereabouts that day. The trial court denied the motion for surrebuttal, and the jury

---

[1] Appellant was also indicted on charges of first-degree burglary (D.C. Code § 22-801(a)); kidnapping (D.C. Code § 22-2001); aggravated kidnapping (D.C. Code §§ 22-2001, -3611); extortion (D.C. Code § 22-3251); aggravated first-degree felony murder while armed (D.C. Code §§ 22-2101, -4502); arson (D.C. Code § 22-301); and first-degree theft (D.C. Code §§ 22-3211, -3212).

convicted appellant of all counts. Appellant was sentenced to four terms of life imprisonment without release.

On appeal, appellant argues that the trial court committed reversible error when it denied his motion for surrebuttal. We affirm appellant's premeditated murder convictions for the deaths of Savvas Savopoulous, Amy Savopolous, Veralicia Figueroa, and Philip Savopolous. As we discuss, while the trial court should have allowed appellant to present surrebuttal evidence, the weight of the other overwhelming evidence against appellant rendered any error by the trial court in denying surrebuttal harmless. Finally, we remand this case to the trial court so that appellant's felony-murder convictions may be merged into his premeditated murder convictions, with any decisions on resentencing left to the trial court. In all other respects, the judgment is affirmed.

## I.    Background

Early in the afternoon of May 14, 2015, first responders arrived at a house in a neighborhood in the Northwest quadrant of D.C. after receiving reports of a house fire. When the firefighters arrived, they discovered that one of the bedrooms on the second floor was engulfed in flames, and they searched for victims. In a separate

bedroom, firefighters found the bodies of Amy and Savvas Savopoulos, the homeowners, and Vera Figueroa, their housekeeper. In another room, firefighters found the body of Philip Savopoulos, Amy and Savvas's ten-year-old son.

When the smoke cleared, one of the firefighters described seeing a "bloodbath" because blood covered the floor of one of the bedrooms and a bloody baseball bat was on the bed. A medical examiner testified that all four victims were stabbed, and the three adults had been beaten, restrained, and doused with gasoline.

**A. The Government's Case-in-Chief**

Police found appellant's DNA at the Savopoulos home. A Domino's pizza box was found in the bedroom with the adult victims, and appellant's DNA was on the pizza crust. Appellant's partial genetic profile was on the back of a knife that was propping open a window in the basement. Two hairs matching appellant's DNA profile were recovered from a hard hat in the garage and a bedroom.[2]

---

[2] Appellant was aware of the Savopolous family. Savvas was the owner of American Iron Works, where appellant worked as a welder from 2003 until 2005.

The government's theory was that appellant kidnapped, restrained, and extorted the decedents for cash before killing them and setting the house on fire. The government contended that appellant broke into the Savopoulos home sometime between 11:29 a.m. and 3:14 p.m. on May 13, 2015, and cut their home phone lines. During that timeframe, Philip was home with the housekeeper, Mrs. Figueroa, while his mother Amy was out walking, so the government posited that appellant first restrained the child and the housekeeper. Then, when Amy came home, he was able to restrain her as well, followed by the restraint of the father, Savvas, after he returned home from work.[3] While they were held captive, the victims were subjected to various forms of violence, including being beaten, stabbed, and asphyxiated, doused with gasoline, and their bodies were burned. The government argued that appellant forced Savvas to obtain $40,000 in cash from his company's bank account and have it delivered to the house. After the cash was delivered the following day, all in $100 bills, the government contended that appellant burned the house to destroy the evidence.

The government presented the following additional evidence that appellant had been at the Savopoulos home and was exhibiting consciousness of guilt. At

---

[3] The idea that appellant restrained each hostage one at a time, at different points in the day, was important to the government's case because the defense contended throughout trial that this could not have been a "one man job."

about 12:10 p.m. on May 14, two people visiting a nearby house saw appellant walk into the Savopouloses' garage. Later that afternoon, around 5:00 p.m., two different people saw appellant pacing in a parking lot shortly before firefighters recovered the Savopouloses' Porsche burning in the woods nearby. Around 6:00 p.m. that same day, appellant began using his iPhone to search for information about how to remove its iCloud feature and whether it had a memory card. Appellant also called his girlfriend and asked if cell phones could be traced. That night, appellant used his phone to search for information on how to beat a lie detector test and looked up a fire at Woodland Drive (the Savopouloses' street). The following day, on May 15, appellant went to the gym with his friend and flashed $1,200 in cash, all $100 bills. Later that evening, appellant called the same friend to ask for help burning his minivan, which the friend declined. Shortly thereafter, firefighters found appellant's minivan on fire.

Appellant's girlfriend, Vanessa Hayles, testified that on May 16, appellant went to visit her in New York City, where he continued to pay for items using $100 bills. He also continued to search for information about the murders on his cell phone and searched for "hideout cities for fugitives" and extradition law. While in New York, appellant and Hayles saw a news report about the Savopoulos murders

that included appellant's photograph.  The next day, appellant chartered a taxi back to D.C. and told Hayles that he was going to self-surrender.

Later that day, appellant's brother, Darrell, contacted a friend, Chelsea Nunez, and asked her to get money orders for a "friend" who needed to hire a lawyer.  Nunez picked Darrell up in her car, and he gave her $2,800 in $100 bills to purchase the money orders.  Afterwards, they picked appellant up from a hotel just outside of D.C.  Appellant got into the car with Nunez, but Darrell exited Nunez's car and got into a different car, and told Nunez to follow him.  As both cars were driving, law enforcement stopped both vehicles and arrested appellant.  When police searched the two cars, they found $7,300 in cash in the car Darrell was riding in, but no cash in the car appellant was in.

The government presented cell-site data for Darrell's primary cell phone showing that it did not connect with any cell towers near the Savopoulos house on May 13 or 14.  Steffon Wint testified that he had no memory of where he was on May 13 or 14.  The government introduced time sheets from May 13 showing that Steffon worked from 6:00 a.m. to 4:30 p.m., and from May 14 showing that Steffon worked from 6:00 a.m. to midnight.  The only signatures on the time sheets were Steffon's, suggesting that his supervisor did not certify the hours worked.

## B. The Defense

Appellant presented a third-party perpetrator defense, arguing that his brothers, Darrell and Steffon, were the actual perpetrators. Appellant testified that Darrell brought him to the Savopoulos home on May 14 (the day after the kidnappings) under the premise that Darrell and Steffon needed help completing a construction project. Appellant testified that he went inside the home, but once he realized that his brothers were burglarizing it, he left, and did not realize the extent of their plan to murder anyone.

Appellant responded to much of the evidence against him. In appellant's version of events, he left his house in the early morning hours on May 13, to meet up with Darrell, who asked him for help with a painting and drywall project that he was working on with Steffon. Appellant testified that he met Darrell around 6:00 a.m. near PCM Services, a construction company in Beltsville, Maryland, but Darrell had changed the plan. Darrell told appellant that he and Steffon no longer needed appellant's help, but would pay to borrow appellant's minivan. Appellant agreed, and asked Darrell to drop him off at his friend Ed's house and pick him up in the minivan later. Appellant testified that he did not sleep at home the night of May 13 because he spent the afternoon at Ed's house and fell asleep there after drinking too

much alcohol. Appellant testified that Darrell returned the next morning, May 14, to pick appellant up, but he was driving a Porsche instead of appellant's minivan. Darrell told appellant that he and Steffon now needed appellant's help completing the drywall and painting job, and drove him to the job site, which turned out to be the Savopouloses' house. Appellant went inside with Darrell and sat in the dining room while Darrell went upstairs. Darrell then came downstairs with a pizza box, and appellant took a bite before putting the crust back in the box because it was cold. Appellant then realized he left his phone in the Porsche, and Darrell told him to go out and get it, but to come back in through the garage. When appellant got back inside, Darrell gave him a hard-hat and construction vest and explained that they were going to "unload" the house, which appellant understood to mean rob it. Appellant testified that he told Darrell he wanted no part in the robbery, so he left and tried to find a bus.

Later that evening, appellant saw reports of the house fire on the news and recognized it as the house Darrell had taken him to earlier in the day. He explained that he began looking up information about beating lie detectors so he could protect his brother if the police contacted him. Appellant similarly explained that he looked

up information on extradition and asked for help burning his minivan because he was afraid of being blamed for a crime he did not commit.[4]

## C. The Government's Rebuttal

Darrell testified for the first time in the government's rebuttal case. Darrell denied playing any role in the murders. He recalled visiting his friend, Anthony Anderson, at his home in Gaithersburg, Maryland, on a day in May before appellant's arrest, but he could not remember the exact date. Darrell testified that he went to Gaithersburg to watch a music video Anderson had recently published on the internet. Darrell also recalled that Anderson's cousin and roommate, Ikia Williams, was home that day. Darrell recalled that he stayed at Anderson and Williams' house for a couple of hours and then left to pick up his son from school.

The government sought to corroborate Darrell's testimony by calling Anderson, who testified that Darrell came to his house in Gaithersburg to watch a music video called "Haters Hate," which he had just produced and uploaded to YouTube. Anderson could not recall how long Darrell stayed or what time he left.

---

[4] Appellant did not admit to burning the minivan himself; he said he woke up the next day and it was gone.

The government presented YouTube data showing that the "Haters Hate" video was uploaded on May 13. The government did not present any evidence indicating what time the video was uploaded.

### D. The Proffered Surrebuttal and Trial Court's Ruling

After the government's rebuttal, the defense moved for surrebuttal to present the testimony of Ikia Williams, who was originally on the government's witness list. Defense counsel informed the trial court that she had planned to introduce the proffered surrebuttal evidence during her cross-examination of Williams. However, the government decided not to call Williams after Anderson testified, so defense counsel had no opportunity to examine Williams.

In the grand jury, Williams testified that she remembered Darrell coming over one day in May around 11:00 a.m. to watch one of Anderson's music videos. Williams did not remember exactly which day in May it was, but testified that Darrell texted her before coming over and then called her when he arrived:

Q: . . . [D]o you know what specific date that was in May?

A: No, I'm not quite sure.

Q: All right. Did he either text you or call you prior to coming to your house?

A: He texted me.

Q: Darrell did?

A: Yes.

Q: And when he was outside of your house, did he text you or call you; as best as you can recall?

A: I believe he called me and told me he was at the door.

…

Q: And why do you think he called you to let you know he was at the door?

A: It could've been because I was upstairs, but – I mean, Anthony was downstairs – but he usually does that. Like, if he's at the door, he'll tell me. He won't knock. He'll just tell me he's at the door, and I'll just open it.

Phone records, however, showed that Williams did not receive a call or text from Darrell on May 13; the only communication between Darrell's and Williams' phones in that general timeframe was on May 19. Defense counsel therefore believed that Williams' testimony, combined with the phone records, supported an inference that Darrell was in Gaithersburg on May 19, not May 13.

Before the trial court, defense counsel argued that the proffered surrebuttal concerned a "critical issue" that could impeach Darrell's alibi. As defense counsel

stated: "I mean, I dare to say that this is probably the most critical issue in the trial. If the jury believes that Darrell Wint was at the home of Ikia Williams and Anthony Anderson in those morning hours [of May 13], instead of where Daron Wint says he was, we lose."

The trial court rejected the defense's request for surrebuttal, stating that the proffered testimony: (1) did not pertain to a new matter first raised in the government's rebuttal, and (2) would not have rebutted Anderson's testimony in the government's rebuttal case. This appeal followed.

## II.    Discussion

Appellant argues that the trial court committed reversible error in denying his request for surrebuttal. Specifically, appellant contends that the government's presentation of Darrell's "Gaithersburg alibi" was a new evidentiary matter first raised by the government in its rebuttal case, and that he had a right to rebut that evidence with Williams' testimony and cell phone records. In light of the weight of the overwhelming evidence against appellant, the trial court's error in not allowing surrebuttal was harmless.

## A. Surrebuttal

This court has not had many opportunities to discuss surrebuttal. Other courts have explained that "[i]n a criminal case, the purpose of surrebuttal evidence is to give the defendant an opportunity to rebut or respond to the State's rebuttal evidence." *State v. Ousley*, 419 S.W.3d 65, 70 (Mo. 2013) (en banc). "Most jurisdictions allow surrebuttal evidence only to meet new matter[s] introduced by the prosecution on rebuttal." *People v. Brockman*, 699 P.2d 1339, 1342 (Colo. 1985). The reason for this limitation is that "[p]rejudice occurs only if the prosecution witness goes beyond rebuttal and injects fresh issues on which the defendant is denied the right to present evidence." *United States v. Sadler*, 488 F.2d 434, 435 (5th Cir. 1974).

Although our case law on surrebuttal is limited, this court has held that "where new matters are introduced in rebuttal, . . . the [defendant] has a *right* to surrebuttal." *Gregory v. United States*, 393 A.2d 132, 137 (D.C. 1978) (emphasis in original) (internal citations omitted); *see also Chaabi v. United States*, 544 A.2d 1247, 1250 n.6 (D.C. 1988). The right to present surrebuttal evidence is not unqualified, however, because "[t]he trial court 'has a duty to exclude confusing and distracting evidence on collateral issues.'" *Cannon v. United States*, 838 A.2d 293, 299 (D.C.

2003), as amended (Mar. 2, 2004) (quoting *Carr v. United States*, 585 A.2d 158, 163 (D.C. 1991)).

Appellant focuses heavily on our holding in *Gregory* to argue that he was entitled to surrebuttal as of right because the government raised a "new matter" in its rebuttal. But because it has been so briefly stated, our case law may be misunderstood. Relying on two cases from outside of this jurisdiction, appellant asserts that he had a right to surrebuttal because the government presented new evidence on rebuttal that the defense would not have had reason to address previously, either as a matter of logic or evidentiary relevance. *See United States v. Murray*, 736 F.3d 652, 658-59 (2d Cir. 2013); *Edge v. State*, 393 So. 2d 1337, 1341 (Miss. 1981).

We have never established a per se rule that any new fact introduced in rebuttal warrants surrebuttal as a matter of right. On this point, we pay particular attention to the conclusion in *Gregory* that no surrebuttal was required because "there were no *material* issues injected for the first time in rebuttal." *Gregory*, 393 A.2d at 137 (emphasis added). For example, if the government in this case introduced new evidence on rebuttal that appellant had a pet dog, we doubt that the trial court was required to consider evidence from the defense disproving that he had

a dog. Similarly, if the government introduced evidence on rebuttal that appellant's minivan was a Toyota, the trial court would not have been required to allow appellant to present surrebuttal evidence that his minivan was a Honda. Thus, it is not enough simply to say that evidence is "new;" further analysis is required.

The two cases relied on by appellant further support this point. In *Murray*, 736 F.3d at 659, the Second Circuit's conclusion that the trial court erred by denying surrebuttal was based, in part, on the fact that the "evidence put forth by the government on rebuttal could easily have influenced the jury significantly to reject" appellant's version of events. (Indeed, *Murray* applied the prevailing federal test that we discuss in more detail below.) Likewise, in *Edge*, 393 So. 2d at 1341, the Mississippi Supreme Court's conclusion that surrebuttal should have been allowed was due to the fact that the government's rebuttal evidence "tore the heart out" of a "key part of the appellant's evidence in support of his claim of justifiable homicide."

In *Gregory*, 393 A.2d at 137, we did not need to analyze the proffered surrebuttal because no "material issues" were injected for the first time in rebuttal, though we noted that, in any case, if "appellant had been allowed to take the stand again he would have been able to reiterate only what he had testified to previously." *Id.* In *Bynum*, we concluded that the trial court erred in denying a surrebuttal request

both because the government raised a "new matter" in rebuttal and because of the "*importance* of that [surrebuttal] testimony to appellant's defense." *Bynum v. United States*, 799 A.2d 1188, 1194 (D.C. 2002) (emphasis added). Importantly, in this context, "the determination that evidence is relevant does not exhaust the trial judge's responsibility in deciding whether to admit it." *Winfield v. United States*, 676 A.2d 1, 5 (D.C. 1996) (en banc). Rather, "the trial judge will have discretion to exclude marginally relevant evidence" that might "distract the jury from the issue in this case." *Id*.

Additionally, our holding in *Gregory* relied on *Sadler*, 488 F.2d at 435, in which the Fifth Circuit Court of Appeals explained how a trial should proceed when new matters are introduced on rebuttal:

> By objection, defense counsel should call to the court's attention that a prosecution witness is going into new material which, if admitted, raises questions of rebuttal by the defense. If defense counsel makes no such objection, but waits until the prosecution witness steps from the stand, the court may properly require him to point out the new matter covered and show how he intends to refute it. The objective is efficiently to conclude a trial when each side has had the opportunity to present his view of all issues fairly raised.

*Id*. at 435. In sum, our case law suggests that "[a] decision whether to allow surrebuttal generally lies within the discretion of the trial court. However, the court

should allow a defendant to introduce evidence on surrebuttal that tends to meet new matter presented by the prosecution on rebuttal." *Brockman*, 699 P.2d at 1342.

Several federal courts of appeals have adopted a two-part test to determine whether a trial court should grant the defense's request for surrebuttal. Under this formulation, surrebuttal evidence is merited where (1) the government's rebuttal testimony raises a new issue, which broadens the scope of the government's case, and (2) the defense's proffered surrebuttal testimony is not tangential, but capable of discrediting the essence of the government's rebuttal testimony. *United States v. Moody*, 903 F.2d 321, 331 (5th Cir. 1990); *Murray*, 736 F.3d at 657; *United States v. Sorensen*, 801 F.3d 1217, 1239 (10th Cir. 2015); *United States v. Pon*, 963 F.3d 1207, 1242-43 (11th Cir. 2020) (Martin, J., concurring in part).[5]

---

[5] Additionally, at least two other circuits have acknowledged the test with some approval. *See United States v. Burgess*, 691 F.2d 1146, 1152 n.14 (4th Cir. 1982); *United States v. Wilson*, 134 F.3d 855, 867 (7th Cir. 1998). We have not found a circuit that has explicitly disapproved of the two-part test.

This two-part test is consistent with our case law on surrebuttal. [6] As explained, our case law suggests that examination both of the issue raised in rebuttal and of the defendant's proffered surrebuttal is proper. This two-part test preserves a defendant's right to respond to new matters presented by the government on rebuttal, *Gregory*, 393 A.2d at 137, while also allowing the trial court to "exclude confusing and distracting evidence on collateral issues." *Cannon*, 838 A.2d at 299 (internal quotation marks and citation omitted). We therefore follow this framework for our analysis of whether the trial court abused its discretion by denying appellant's request for surrebuttal.

---

[6] The limitation that surrebuttal is only merited where the government's rebuttal evidence "broadens the scope" of its case may appear inconsistent with *Bynum*, 799 A.2d at 1194. In *Bynum*, this court concluded that surrebuttal was merited because a "new matter" was introduced on rebuttal, which "gutted the defense," but there was no indication that the government's rebuttal broadened the scope of its case. *Cf. Moody*, 903 F.2d at 331 (rebuttal evidence raised a new issue that broadened the scope of the government's case because rebuttal concerned events charged in a separate indictment and expanded the government's case into the realm of bankruptcy fraud). However, both *Bynum* and *Gregory* suggest that it is proper for the trial court to assess the *materiality* of the government's new rebuttal evidence before giving the defense an opportunity for surrebuttal. *See Gregory*, 393 A.2d at 137; *Bynum*, 799 A.2d at 1194.

### 1. Whether the government's rebuttal testimony raised a new issue

We generally agree with appellant that the specific implication that Darrell was in Gaithersburg on the morning of May 13, as opposed to the general issue of Darrell's whereabouts on May 13 and May 14, "did not arise until . . . rebuttal to appellant's testimony." *See Bynum*, 799 A.2d at 1194. Additionally, appellant did not have a meaningful opportunity earlier in the trial to rebut Darrell's presence in Gaithersburg on May 13. It would have made little sense for appellant, during his defense case, to call a witness to testify about where Darrell was *not* on May 13. Likewise, for appellant to introduce evidence that Darrell was in Gaithersburg on May 19—several days after the murders took place—"would have done nothing to advance his case or clarify any issue then relevant." *Murray*, 736 F.3d at 658. However, we understand the trial court's resistance to call the government's rebuttal a "new issue," since the defense asserted that Darrell was at the house, participating in the burglary and murders, while the government maintained throughout the trial that appellant acted alone, thereby implying that Darrell and Steffon Wint were not in the vicinity of the crimes when they occurred.

Though we ultimately agree with appellant that the government introduced a new issue on rebuttal, we disagree that surrebuttal was per se required, as of right,

on that basis alone. Instead, we must consider the second part of the test: whether the proffered surrebutal was capable of discrediting the essence of the government's rebuttal testimony.

**2. Whether the proffered surrebuttal was capable of discrediting the essence of the government's rebuttal testimony**

Surrebuttal is merited when a new matter arises and when the defense's proffered surrebuttal testimony is not tangential, but rather is capable of discrediting the essence of the government's rebuttal testimony. *E.g., Sorensen*, 801 F.3d at 1239. The second part of this analysis properly allows the trial court to exercise its discretion over the admissibility and scope of surrebuttal. *See Cannon*, 828 A.2d at 299. "Our review of the trial court's decision in this regard is considerably deferential because of its superior vantage point during the course of the trial." *Shelton v. United States*, 983 A.2d 979, 986 (D.C. 2009) (analyzing discretion in admitting rebuttal evidence).

The government put forth rebuttal evidence to support the assertion that Darrell was in Gaithersburg on May 13 and could not have participated in the crimes.

The government first called Darrell, who recalled visiting Anderson to watch a music video that Anderson had recently made. Darrell also recalled seeing Williams but could not remember the date of the visit. The government also called Anderson, who testified that Darrell visited him to watch the "Haters Hate" video Anderson had just created and uploaded to YouTube; however, Anderson also could not remember the exact date but acknowledged that a time stamp showed that the video was uploaded on May 13. Thus, the "essence" of the government's rebuttal evidence was that Darrell visited Anderson in Gaithersburg on May 13. *See Murray*, 736 F.3d at 659.

In contradiction, Williams' grand jury testimony implies that Darrell visited on May 19. Williams testified that Darrell usually called or texted prior to coming to Williams' house, and she recalled that Darrell had texted her prior to coming to her house. The phone records showed that Williams did not receive a call or text from Darrell on May 13. Instead, phone records show communication between Darrell and Williams on May 19. Thus, assuming that Williams would have testified consistent with her grand jury testimony, her testimony was capable of discrediting the government's assertion that Darrell was in Gaithersburg on May 13.

The trial court concluded that Williams was testifying based on her memory of what Darrell "usually" does, and was equivocal about whether Darrell called or texted her the exact day he went to her house to watch music videos with Anderson. Therefore, the trial court implicitly concluded that the proffered cell phone records showing a lack of communication between Williams and Darrell on May 13 would not squarely meet and call into question the government's suggestion that Darrell was in Gaithersburg on that date.

We disagree that Williams was too "equivocal" for her testimony to squarely meet and question the Gaithersburg alibi. Williams did not remember the specific date in May, but she stated, unequivocally, "[Darrell] texted me[,]" before coming over to the house. Then, when Darrell was at the front door, she answered, less certainly, "I believe he called me and told me he was at the door." However, she was clear that Darrell had texted before leaving for her house. The cell phone records, showing only communication on May 19, supported appellant's assertion that Darrell was in Gaithersburg on May 19 instead—not May 13.

Williams' testimony made it "less probable" that Darrell had visited Gaithersburg on May 13. This evidence should have gone to the jury. *See Jones v.*

*United States*, 625 A.2d 281, 284 (D.C. 1993). To the extent that Williams' testimony conflicted with the testimony of either Darrell or Anderson, both of whom were also equivocal about the exact date of the visit, "it is the jury's job . . . to evaluate . . . credibility[.]" *See Bynum*, 799 A.2d at 1194.

Finally, appellant wanted to present evidence from one witness and the relevant phone records from May 19. The surrebuttal therefore would not have been too lengthy or distracting and would not have risked turning the proceedings into a "trial-within-a-trial." *See Winfield*, 676 A.2d at 5.

The proffered surrebuttal evidence did squarely meet and call into question the government's suggestion that Darrell was in Gaithersburg on the date of the murders. "Although surrebuttal is indeed within the sound discretion of the trial court, it should have been permitted under the circumstances presented here." *Chaabi*, 544 A.2d at 1249 (internal citation omitted). We conclude that the trial court erred in denying appellant's request to present surrebuttal evidence.

## B. Harmless Error

We next review the trial court's error to determine whether we must reverse. First, we briefly address the proper standard of review. While both appellant and the dissent maintain that a denial of a surrebuttal request is generally of constitutional dimension, they cite no case law for that broad proposition. Moreover, as the dissent acknowledges, appellant's constitutional claim was not preserved. Thus, we would apply a plain error test even if the error were of constitutional dimension, and appellant would be unable to meet that demanding standard. But we disagree with appellant's contention that a constitutional error analysis applies.

Although the erroneous exclusion of evidence proffered by the defense—"the type of problem we confront in the present case"—"may violate a defendant's constitutional right to present a defense[,] [n]ot every such error will do so." *Heath v. United States*, 26 A.3d 266, 276 (D.C. 2011) (internal quotation marks omitted). *see Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir. 2001) ("Erroneous evidentiary rulings rarely rise to the level of harm to this fundamental constitutional right to present a meaningful defense.") (internal quotation marks omitted). "'Only when the error deprives a defendant of a fair trial does it amount to a constitutional

violation.'" *Heath*, 26 A.3d at 276 (quoting *United States v. Lathern*, 488 F.3d 1043, 1076 (D.C. Cir. 2007)).

Under the non-constitutional error standard, this court would need to "say with fair assurance that any such presumed trial court error did not substantially influence the jury's determination." *Roundtree v. United States*, 581 A.2d 315, 328-29 (D.C. 1990) (citing *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). *Cf. Bynum*, 799 A.2d at 1194 (reversing because we could not say "with fair assurance" that the verdict was not influenced by trial court's error in denying appellant's request to present witness in surrebuttal). We conclude that there was no reversible error.

The proffered surrebuttal evidence certainly undercut Darrell's alibi somewhat, but it did not affect the weight of the other evidence against appellant. Genetic evidence implicating appellant was found in several locations in the Savopolous home: on the pizza delivered to the home on the night the victims were held captive, on the knife propping open the basement window, and on two hairs found in the garage and in a bedroom. Appellant was seen entering the Savopolouses' garage just an hour before the house was set on fire. Appellant was

also seen pacing in a parking lot near where the Savopouloses' Porsche was found burning. In the week after the murders, appellant displayed large sums of cash in $100 bills. Appellant also searched online for information on beating lie detector tests and restoring cell phones to factory settings. He also searched for news stories on the fire at the Savopolous house.

Additionally, Darrell's trip to Gaithersburg only provided an alibi for a short period of time in the morning or early afternoon of May 13. The government's evidence indicated that the perpetrator of the crime broke into the Savopoulos home sometime before 3:14 p.m. on May 13. Even if the jury believed that Darrell was in Gaithersburg for a couple of hours that morning, the rebuttal evidence did not preclude him from returning to D.C. to participate in the crimes. In closing, defense counsel herself stated:

> What Daron told you is that, after he met up with Darrell [in Beltsville] on May 13th in the morning and they go to Ed's house, he's left at Ed's house sometime around 9 a.m. in southeast D.C. And then Darrell drives off. [Appellant] has no idea where Darrell [went] after that. There's no reason that Darrell Wint couldn't have left there and gone to Gaithersburg at 10:20 a.m. to meet up with whoever it is that he needed to meet up with to get the rest of his day done. It actually doesn't particularly matter, anyways.

Defense counsel also pointed out other inconsistencies in Darrell's testimony and alibi. Therefore, the jury was aware that Darrell only had, at most, a partial alibi from the Gaithersburg trip, and yet the jury still did not credit appellant's third-party perpetrator defense.

There was ample evidence to convict appellant. In light of the strength of the combined evidence against appellant, we can say with fair assurance that the trial court's error did not substantially influence the jury's decision.

## C. Merger

Finally, we address appellant's argument that we must remand for merger and resentencing. The government concedes that appellant's felony and premeditated murder convictions must merge. *See Jackson v. United States*, 750 A.2d 551, 552 (D.C. 2000). Appellant argues that the predicate felony offenses must merge into his felony murder convictions, and the premeditated murder convictions must merge into the felony murder convictions. The government argues that the felony-murder convictions should be vacated instead, allowing the burglary and kidnapping charges to stand.

We agree with the government that the felony murder convictions must merge into the premeditated murder convictions. The trial court imposed concurrent sentences of life without release for the homicide convictions. She also imposed additional sentences of 96 months for the burglary and the kidnappings of the adult victims, 144 months for the kidnapping of Philip, 28 months for extortion and first-degree theft, and 66 months for arson. She specified that the non-homicide sentences will run concurrent to the life sentences. "Vacating the felony murder conviction, not the premeditated murder *and* [predicate felony] convictions, best effectuates the trial court's sentencing plan." *Lester v. United States*, 25 A.3d 867, 872 (D.C. 2011) (emphasis in original).

We remand the case for the sole purpose of providing the trial court with the opportunity to vacate the felony murder convictions with respect to each decedent. *See Baker v. United States*, 867 A.2d 988, 1010 (D.C. 2005). We leave decisions on resentencing to the trial court. *See Lee v. District of Columbia*, 22 A.3d 734, 737 n.2 (D.C. 2011). We affirm and do not disturb the premeditated murder convictions or the burglary and kidnapping convictions.

### III.    Conclusion

In sum, we affirm appellant's premeditated murder convictions for the deaths of Savvas Savopoulous, Amy Savopolous, Veralicia Figueroa, and Philip Savopolous.  We remand with the instructions to vacate appellant's felony murder convictions.  In all other respects, the judgment is affirmed.  As we explained, appellant should have been granted the opportunity to present surrebuttal evidence.  The government introduced a new factual issue in its rebuttal, and the proffered surrebuttal evidence was "capable of discrediting the essence of the government's rebuttal testimony."  *See, e.g.*, *Murray*, 736 F.2d at 657.  However, in light of the overwhelming weight of other evidence against appellant, there are no grounds for reversal.

*It is so ordered.*

EASTERLY, *Associate Judge*, concurring in part and dissenting in part: The majority holds that the trial court erred in denying Mr. Wint surrebuttal.  I concur in that determination as well as the determination that we must nevertheless affirm, but I write separately to explain why I reach these conclusions.

Specifically, I believe we must follow our binding precedent, which provides that when the government has raised a "new matter"—which by definition is material—in its rebuttal case, an individual has a *right* to present surrebuttal evidence that is undergirded by a defendant's Fifth and Sixth Amendment right to present a defense. To the extent that the majority's new test for surrebuttal seeks to limit that right or downgrade it to a matter of trial court discretion, I disagree that (1) we have either the constitutional leeway or the power as a division of this court to impose such a limitation, (2) the record or the briefing in this case call for such a limitation, and (3) the out-of-jurisdiction decisions cited by the majority provide much in the way of support for such a limitation. But I hasten to add that it is not clear that this is what the majority opinion is doing with its new test, and for this reason too I decline to sign on to its surrebuttal analysis.

Nevertheless, I agree that affirmance is warranted, but not because the trial court's erroneous denial of surrebuttal in this case is subject to harmless error review. Instead, because Mr. Wint did not argue that his right to surrebuttal had constitutional implications in the trial court, that claim is subject to plain error review. Under the test for plain error, Mr. Wint has neither argued nor demonstrated that he can make a showing that the trial court's ruling affected his substantial rights.

## I.       The "Right" to Surrebuttal Under Our Law

Understanding the ordinary sequence of the presentation of evidence and attendant constitutional concerns is critical to discerning when surrebuttal must be permitted—as a constitutional matter and under our case law—versus when it is discretionary.   The government in a criminal case has the burden to prove a defendant's guilt of the charged crimes beyond a reasonable doubt.  *See Griffin v. United States*, 144 A.3d 34, 36 (D.C. 2016) (citing *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993)).  Typically, the government carries this burden by presenting all of its evidence in its case-in-chief.  As a constitutional matter, a defendant has a right to respond to the government's case and present their own evidence.  *Facebook, Inc. v. Wint*, 199 A.3d 625, 633 (D.C. 2019) ("Whether rooted directly in the Due Process Clause, or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense."  (brackets omitted)); *see also Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.").

If, after the government presents its case, a defendant opts to put on a defense, the government may seek to present rebuttal evidence. The government does not have a constitutional right to present such evidence, so whether the government may extend the evidentiary phase of the trial by presenting a rebuttal case is "committed to the discretion of the trial judge." *Rowland v. United States*, 840 A.2d 664, 680 (D.C. 2004). The government is only supposed to use rebuttal evidence to "explain, repel, counteract, or disprove" the defense evidence. *Gregory v. United States*, 393 A.2d 132, 137 (D.C. 1978). The government is generally not supposed to use rebuttal to "advance new arguments" and thereby undercut a defendant's right to present a defense. *Shelton v. United States*, 983 A.2d 979, 985 (D.C. 2009). But, as evidenced by this case, sometimes the government seeks to delve into an entirely new matter on rebuttal, not in an effort to sandbag the defense, but in order to respond to a defendant's affirmative defense and carry its burden of proof.

Regardless, if the government is permitted to introduce "new matters" on rebuttal, which are by definition material, our court has clearly stated that a defendant has a concomitant "right" to surrebuttal. *Gregory*, 393 A.2d at 137 (providing that "where new matters are introduced in rebuttal, [the defense] has a *right* to surrebuttal" and concluding that, because the government had not injected any "material issues . . . for the first time in rebuttal," the defendant's right to

surrebuttal was not violated); *accord Chaabi v. United States*, 544 A.2d 1247, 1249 n.6 (D.C. 1988) (stating that, when the government introduces a new matter on rebuttal, surrebuttal is "mandatory"); *see also Bynum v. United States,* 799 A.2d 1188, 1194 (D.C. 2002) (finding error in denial of surrebuttal where it was important to the defense to respond to the new matter introduced by the government on rebuttal). This right to surrebuttal as acknowledged by our court is clearly constitutionally compelled as a product of a defendant's rights to due process and to present a defense, *see Chambers v. Mississippi*, 410 U.S. at 294, notwithstanding that we have not explicitly drawn the connection to the relevant constitutional provisions.

Here, Mr. Wint put forth a third-party perpetrator defense. In response, the government presented what the majority characterizes as "at most[] a partial alibi" for the potential third-party perpetrator. *Ante* at 28. The fact that the proffered rebuttal evidence was not terribly strong might have given the trial court grounds to exclude it. But once the court permitted rebuttal of this nature, addressing what was unquestionably a new matter, it triggered Mr. Wint's right under our case law and the Constitution to put responsive evidence before the jury attacking the partial alibi.

## II. The Majority Opinion's Surrebuttal Analysis

For reasons that are not clear to me, the majority opinion makes this more complicated. Although it acknowledges that pursuant to *Gregory* a defendant has a "right" to surrebuttal where the government introduces a new matter on rebuttal, it contradictorily asserts that the "decision whether to allow surrebuttal generally lies within the *discretion* of the trial court." *Ante* at 15, 17 (emphasis added). The majority opinion then seeks to structure that perceived discretion by borrowing one or both parts of a two-part test from case law outside this jurisdiction and requiring that a defendant seeking to present surrebuttal show that the proffered testimony is "not tangential, but rather is capable of discrediting the essence of the government's rebuttal testimony." *Id*. at 18, 19-21. I am opposed to the majority's new test for three reasons.

First, I disagree that we have either the constitutional leeway or the power as a division of this court to convert the "right" to surrebuttal into a discretionary call. *Gregory* expressly states that it is only when the government has *not* introduced a new matter on rebuttal that the court has discretion to decide whether or not to permit surrebuttal; otherwise, a defendant has a "*right*" to present such evidence:

> [W]here new matters are introduced in rebuttal, . . . the witness has a *right* to surrebuttal. *United States v. Sadler*, 488 F.2d 434 (5th Cir.), *cert. denied*, 417 U.S. 931 (1974); *Turner v. United States*, 441 F.2d 736 (5th Cir. 1971); 6 J. Wigmore, Evidence § 1874 (Chadbourne rev. 1976). In *all other cases*, surrebuttal is within the sound discretion of the judge.

393 A.2d at 137 (second emphasis added) (parallel citations omitted). As a division of this court, we are bound by our prior precedent. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

*Gregory*'s citation to *United States v. Sadler*, 488 F.2d 434 (5th Cir. 1974), does not, as the majority suggests *ante* at 17, undercut its categorical holding. To the contrary, the Fifth Circuit in *Sadler* applied the new-matter test and held that the government had not presented a new matter on rebuttal. 488 F.2d at 436 (adopting the reasoning from *Turner*, 441 F.2d at 739, that "[t]he testimony of the government's rebuttal [witness] in this case does not appear to us to be 'new'").[1]

---

[1] The passage from *Sadler* that the majority opinion block-quotes, *ante* at 17 (quoting 488 F.2d at 435), has nothing to do with the substantive test for surrebuttal, but rather relates to the procedural history of the case where counsel asked for surrebuttal but at no point identified a new matter raised on rebuttal. *Id.* at 435-36. In this context, the Fifth Circuit opined that defense counsel should have objected during rebuttal to any new matter raised and that, if counsel waited until the rebuttal witness left the stand, counsel would have to persuade the court that the government had presented a new matter and that the defense had evidence that was responsive. *Id.* But that is nothing more than the basic new-matter and relevance tests at work,

Apart from *Sadler*, the majority opinion finds support for its test in a trial court's duty to "exclude confusing and distracting evidence on collateral issues." *Ante* at 14. But that duty derives from basic rules of relevance and the balancing of probity versus prejudice.[2] *See, e.g.*, *Parker v. United States*, 249 A.3d 388, 404 (D.C. 2021) (affirming the exclusion of "distracting or confusing" testimony as more prejudicial than probative); *Williams v. United States*, 571 A.2d 212, 215 (D.C. 1990) (explaining that evidence must be relevant to avoid "time-consuming and confusing . . . collateral issues" (quoting *Williams v. New York*, 337 U.S. 241, 246-47 (1949)). These rules constrain the universe of surrebuttal evidence the defense can use after the government's introduction of a new matter triggers the right recognized in *Gregory*; they cannot not qualify the right to present surrebuttal evidence itself.[3]

---

and the procedural concern at issue in *Sadler* has nothing to do with the substantive question presented in this case.

[2] The cases the majority cites—*Cannon* and *Winfield*—illustrate this proposition. *Ante* at 14, 17; *see Cannon v. United States*, 838 A.2d 293, 299 (D.C. 2004) (citing *Carr v. United States*, 585 A.2d 158, 163 (D.C. 1991), which cites *Smith v. Executive Club, Ltd.,* 458 A.2d 32, 41 (D.C. 1983), which in turn cites cases discussing Federal Rules of Evidence 401 and 403); *Winfield v. United States*, 676 A.2d 1, 3, 5 (D.C. 1996) (en banc) (discussing the District's one standard of relevance).

[3] The majority opinion quotes *Cannon* as if it applied this limitation to the right of surrebuttal. *Ante* at 14. But in *Cannon*, this court concluded that the

Second, I disagree that the record or briefing in this case call for this recasting of the surrebuttal right as a matter of discretion. The majority opinion asserts that this court "ha[s] never established a per se rule that any new fact introduced in rebuttal warrants surrebuttal as a matter of right." *See ante* at 15. That statement is correct, but inapposite in the context of this discussion. The issue before us is not whether the government presented evidence regarding some new extraneous fact on rebuttal (though query why it should be permitted to do so, given the limitations on rebuttal, as discussed *supra*). Here, as the majority acknowledges, the government's rebuttal clearly went beyond mere extraneous new facts and met the "new matter" threshold established in *Gregory*. *See ante* at 20-21. Mr. Wint was therefore entitled to surrebuttal as a matter of right, within the bounds of the rules of evidence. *See supra*. Further, the government never challenged the *Gregory* rule in this case or urged the imposition of a more stringent test for allowing surrebuttal. The trial court denied surrebuttal because it concluded that the government's rebuttal evidence was "not a new matter that[ wa]s being introduced," and the government exclusively

---

defendant had no right to surrebuttal because the government's rebuttal evidence had been stricken. 838 A.2d at 299. In other words, because there was no new matter to respond to, the right to surrebuttal was not triggered.

defends that ruling.[4]  It does not try to argue that, if there is a right to surrebuttal, that right is somehow qualified or discretionary.

Third and finally, I disagree that the out-of-jurisdiction decisions on which the majority relies provide much in the way in the support for such a limitation.  The majority looks to "several" federal court of appeals decisions that allow presentation of surrebuttal evidence only "where (1) the government's rebuttal testimony raises a new issue which broadens the scope of the government's case, and (2) the defense's proffered surrebuttal testimony is not tangential, but capable of discrediting the essence of the government's rebuttal testimony."  *Ante* at 18 (citing *United States v. Moody*, 903 F.2d 321, 331 (5th Cir. 1990); *United States v. Murray*, 736 F.3d 652, 657 (2d Cir. 2013) (citing *Moody*); *United States v. Sorensen*, 801 F.3d 1217, 1239 (10th Cir. 2015) (citing *Murray*); and *United States v. Pon*, 963 F.3d 1207, 1243 (11th Cir. 2020) (Martin, J., concurring in part)).  The majority opinion says "[t]his two-part test is consistent with our case law on rebuttal" but then immediately acknowledges, *ante* at 19 n.6, that the first part of this test "may appear inconsistent

---

[4] The court also stated that it "[did]n't think [the proffered surrebuttal] testimony would rebut testimony . . . provided in the Government's rebuttal case," but as the government acknowledged in its brief, the court made this remark in denying the defense's request for a missing witness instruction, not with regard to the request for surrebuttal.

with *Bynum*, 799 A.2d at 1194."[5]  For the reason the majority identifies, it *is* inconsistent with *Bynum*, where the rebuttal evidence impeaching the theory of defense did not broaden the scope of the government's case, but we nevertheless held the defendant had a right to surrebuttal.  799 A.2d at 1194.  Moreover, the second part of this test is likewise incompatible with our precedent because it squarely conflicts with *Gregory*.  *See supra*.  The majority ignores the fact that a comparable number of circuits to have considered the issue of surrebuttal do not require special scrutiny of proffered surrebuttal testimony[6]—aligning with this court's approach in *Gregory* and with the approach endorsed in *Wigmore*.  6 *Wigmore on Evidence* § 1874 ("[E]vidence explaining away the effect of new facts

---

[5] Although the majority opinion acknowledges the tension between the first part of its test and *Bynum*, it is not entirely clear where the majority opinion lands. It seems ultimately to conclude that the trial court should assess not only whether the government has introduced a new matter on rebuttal (as authorized by *Gregory*), but also somehow assess the materiality of the government's rebuttal evidence, notwithstanding that any "new matter" introduced on rebuttal is by definition material.

[6] *See United States v. Purkey*, 428 F.3d 738, 759 (8th Cir. 2005) (stating that surrebuttal is appropriate "when new matters are raised in the rebuttal testimony"); *United States v. Barnette*, 211 F.3d 803, 821 (4th Cir. 2000) ("Surrebuttal evidence is admissible to respond to any new matter brought up on rebuttal."); *United States v. Leon-Delfis*, 203 F.3d 103, 114 (1st Cir. 2000) (stating that surrebuttal is allowed "to explain away new facts brought forward by the proponent in rebuttal, or evidence to impeach a witness who testified in rebuttal" (internal quotation marks omitted)); *see also United States v. Butcher*, 926 F.2d 811, 817 (9th Cir. 1991) (assessing the district court's denial of surrebuttal solely as to whether the evidence would be cumulative, not under a heightened standard of materiality).

brought forward by the proponent in rebuttal . . . is . . . entitled to be received, without depending on the court's discretion.").

Ultimately, it is unclear what function the majority opinion's new test serves other than to sow confusion. Employing it in this case, the majority concludes that, because the proffered surrebuttal testimony "implie[d]" that the "essence" of the government's rebuttal evidence was incorrect and "made it less probable that" the alleged third-party perpetrator's partial alibi was true, this evidence was "capable of discrediting the government's" rebuttal within the meaning of this test and should have been put before the jury. *Ante* at 22-24. In other words, the proffered surrebuttal evidence was not required to be a conclusive or total refutation of the government's rebuttal for Mr. Wint's right to surrebuttal to adhere even under the majority's test. Furthermore, the majority opinion holds that the trial court "erred," *ante* at 24—not that it abused its discretion. This is just as well. A defendant's right to present a defense and to respond to the evidence against them must take precedence over any desire to facilitate efficient courtroom management, and it therefore limits any more extensive application of this test.

### III. Harmlessness

Although I agree with the majority opinion that the trial court erred in ruling that Mr. Wint could not present evidence in surrebuttal, I part ways again with the majority opinion in analyzing whether the trial court's ruling denying Mr. WInt surrebuttal constitutes reversible error. The majority opinion analyzes this ruling under the standard for non-constitutional errors set forth in *Kotteakos v. United States*, 328 U.S. 750, 765-66 (1946). *Ante* at 26. I would instead consider this as constitutional error, given that the right to surrebuttal when the government has introduced a new matter on rebuttal is constitutionally grounded, see *supra*, meaning the standard for constitutional errors set forth in *Chapman* would apply. *See Chapman v. California*, 386 U.S. 18, 24 (1967) (holding constitutional errors to a standard of "harmless beyond a reasonable doubt"). The problem is that Mr. Wint did not preserve a constitutional claim. While he asked for surrebuttal, he never mentioned the right to due process or to present a defense, or cited to the Fifth or Sixth Amendments of the Constitution; he never mentioned the Constitution at all.[7]

---

[7] Not every request is one of constitutional dimension. *See Mack v. United States*, 6 A.3d 1224, 1234 (D.C. 2010) ("Mr. Mack did not mention the Second Amendment in the trial court, and his reliance on the common law doctrine of self-defense was not sufficient to raise a constitutional claim."); *Comford v. United States*, 947 A.2d 1181, 1188 (D.C. 2008) (explaining that "a hearsay objection [will not] preserve a Confrontation Clause claim"); *see also Paige v. United States*, 25 A.3d 74, 81 (D.C. 2011) (explaining that "[o]bjections must be made with reasonable

And thus our review should be for plain error. *See Marquez v. United States*, 903 A.2d 815, 817 (D.C. 2006) ("Because counsel objected at trial to the admission of the statement on purely evidentiary grounds and did not raise a Confrontation Clause objection, we must review the claim for plain error." (footnote omitted)). Mr. Wint did not attempt to satisfy the test for plain error, but even if he had, I would conclude that he could not meet the third prong of the test requiring a showing that the trial court's ruling adversely affected his substantial rights, for the same reasons the majority provides in its *Kotteakos* analysis *ante* at 26-28. *See Pérez v. United States*, 968 A.2d 39, 93 (D.C. 2009) (citing *United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004)) (stating that the "substantial rights" standard is "similar to the *Kotteakos* formulation," except that "it is the defendant rather than the [g]overnment who bears the burden of persuasion with respect to prejudice" (brackets and internal quotation marks omitted)).

In sum, although I agree with the majority opinion's determination that the trial court erred but that that error does not warrant reversal, I disagree with substantial components of its reasoning. The new test the majority opinion adopts for surrebuttal only complicates and confuses this area of the law and threatens to

---

specificity; the judge must be fairly apprised as to the question on which he is being asked to rule").

impinge on a defendant's constitutional rights should it be literally construed. Further, its analysis concluding that the trial court's error does not warrant reversal disregards the constitutional aspect of Mr. Wint's claim. For these reasons, I respectfully concur in part and dissent in part.