*United States v. Garcia*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

### SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 25th day of March, two thousand twenty-six.

PRESENT:

> JOHN M. WALKER, JR.,
> RICHARD J. SULLIVAN,
> JOSEPH F. BIANCO,
> *Circuit Judges.*

_____

UNITED STATES OF AMERICA,

    *Appellee,*

    v.            No. 24-1673

ISRAEL GARCIA,

    *Defendant-Appellant,*

JEVAUN CHARLES, ALYSHA BELTRE, DEURI
CARAMBOT, SHAKUR CULBERT, ALVIN
FERNANDEZ, JASON GONZALEZ, MALCOLM
RIVERA, MIKE SILVA, DANIEL SILVA,
MAXWELL SMITH, MARLON WATSON,
KEWAANNEE WILLIAMS,

        *Defendants*.

_____

| | |
|---|---|
| **For Defendant-Appellant:** | CARLA SANDERSON (Megan Wall-Wolff, Wall-Wolff LLC, New York, NY, *on the brief*), Carla Sanderson Law, New York, NY. |
| **For Appellee:** | MAGGIE LYNAUGH (Jonathan L. Bodansky, Jacob H. Gutwillig, James Lightenberg, *on the brief*), *for* Jay Clayton, United States Attorney for the Southern District of New York, New York, NY. |

Appeal from a judgment of the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the June 7, 2024 judgment of the district court is **AFFIRMED**.

Israel Garcia appeals from a judgment of conviction following a jury trial at which he was found guilty of (1) murder in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and 2; (2) participation in a narcotics trafficking conspiracy,

2

in violation of 21 U.S.C. §§ 846, 841(b)(1)(A) and (C); (3) murder while engaged in a narcotics trafficking conspiracy, in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2; (4) use of a firearm in furtherance of a drug trafficking crime that results in death, in violation of 18 U.S.C. §§ 924(j)(1) and 2; (5) using, carrying, and possessing a firearm in connection with a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2; and (6) attempted witness tampering, in violation of 18 U.S.C. §§ 1512(b)(1) and 2. Garcia is currently serving a sentence of life imprisonment. On appeal, Garcia argues that (1) the district court erred by denying his motion for a new trial under Federal Rule of Criminal Procedure 33; (2) there was insufficient evidence to support his conviction for murder in aid of racketeering; (3) the district court made erroneous evidentiary rulings; and (4) the district court abused its discretion by not permitting him to present surrebuttal evidence. We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal.

## I. The District Court Did Not Abuse Its Discretion by Denying Garcia's Rule 33 Motion.

Garcia first argues that the district court erred when it denied his motion for a new trial pursuant to Rule 33. Specifically, he contends that he should be granted a new trial because his trial counsel, Avraham Moskowitz, "labored under an

3

actual conflict of interest that caused a lapse in representation" and deprived him of his Sixth Amendment right to the effective assistance of counsel. Garcia Br. at 18. We disagree.

We review the denial of a Rule 33 motion for abuse of discretion. A district court abuses its discretion in denying a Rule 33 motion "when (1) its decision rests on an error of law" or "a clearly erroneous factual finding" or (2) "its decision – though not necessarily the product of a legal error or a clearly erroneous factual finding – cannot be located within the range of permissible decisions." *United States v. Vinas*, 910 F.3d 52, 58 (2d Cir. 2018) (internal quotation marks omitted). A district court should exercise its authority to grant a new trial only "in the most extraordinary circumstances." *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993). Nevertheless, "[t]he question of whether a defendant's lawyer's representation violates the Sixth Amendment right to effective assistance of counsel is a mixed question of law and fact that is reviewed *de novo*." *United States v. Blau*, 159 F.3d 68, 74 (2d Cir. 1998).

The right to counsel under the Sixth Amendment entails "a correlative right to representation that is free from conflicts of interest." *United States v. Levy*, 25 F.3d 146, 152 (2d Cir. 1994) (quoting *Wood v. Georgia*, 450 U.S. 261, 271 (1981)). A

4

defendant suffers from "ineffective assistance of counsel in violation of the Sixth Amendment if his attorney has (1) a potential conflict of interest that resulted in prejudice to the defendant, or (2) an actual conflict of interest that adversely affected the attorney's performance." *Id.*; *see also Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). To establish an actual conflict of interest, the defendant must establish that his attorney labored under "a conflict of interest that adversely affect[ed] counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002); *see also Armienti v. United States*, 313 F.3d 807, 814 (2d Cir. 2002). And to demonstrate an adverse effect, Garcia must show that counsel's conflict caused him to forgo a defense strategy sufficiently plausible to rise above mere speculation. *See United States v. Schwarz*, 283 F.3d 76, 92 (2d Cir. 2002); *see also Eisemann v. Herbert*, 401 F.3d 102, 108 (2d Cir. 2005).

According to Garcia, trial counsel labored under an actual conflict of interest because he also represented Sherrod Murphy, a potential defense witness in an unrelated prosecution involving Murphy's alleged theft of mail and a postal key, among other unrelated charges. Garcia asserts that Murphy was "repeatedly discussed" in the materials produced pursuant to the Jencks Act, 18 U.S.C. § 3500, for Rayshawn Parker – the government's eyewitness who identified Garcia as the

5

person who shot a rival drug dealer and gang member named Joey McClinton. Garcia Br. at 4. Garcia maintains that Moskowitz's divided loyalty led him to forgo calling Murphy as a defense witness, from investigating leads that Murphy could have provided to impeach Parker, and from cross-examining Parker on any inconsistencies between his and Murphy's purported knowledge of the murder.

But other than a vague assertion that Murphy might have had "helpful information" concerning Parker, Garcia failed to establish that Moskowitz's alleged conflict caused him to forgo a plausible defense strategy or otherwise limited his investigation. *Id.* at 23–25. To the contrary, the record reflects that Moskowitz reviewed the section 3500 materials, recognized that Murphy was identified in those materials, and met with Murphy to investigate whether he had any helpful, admissible information to Garcia's case. App'x at 396–99. Moskowitz also hired a private investigator, who "ran down every possible lead" and "interviewed every witness" that he could find, including every witness that Garcia had suggested might have knowledge of the shooting. *Id.* at 398 Despite these efforts, Moskowitz was unable "to corroborate" an alternative suspect theory. *Id.*

Garcia nevertheless insists that Moskowitz did not call Murphy as a defense witness because of his competing loyalties. But the suggestion that Murphy's "testimony would have been exculpatory" or beneficial to Garcia is pure conjecture and is in fact contradicted by the record. *See Eisemann*, 401 F.3d at 108. Moskowitz testified that he did not consider calling Murphy as a defense witness because Murphy "had no relevant admissible evidence" that would be helpful to Garcia's case and that, in fact, Murphy's testimony "was potentially devastating" for Garcia on his narcotics and racketeering counts. App'x at 403. Indeed, when Murphy met with Moskowitz on January 3, 2024, Murphy stated that he "never spoke to" Rayshawn Parker about the McClinton murder," that he had no firsthand knowledge of the [McClinton] murder, and that his knowledge was limited to what he had heard "on the street." *Id.* at 406–09. And at the Rule 33 hearing, Murphy reiterated that he had not personally observed the McClinton murder, that he had not spoken to Parker about the murder, and that what he knew of it was limited to "gossip on the street." *Id.* at 409. From this record, there is no evidence to suggest that Murphy would have had any testimony that was admissible or helpful to the defense.

Garcia counters that Murphy's denials of ever having spoken to Parker about the murder could have been used to impeach Parker, who told the government that Murphy was "the only person to whom he ever identified [] Garcia as the shooter." Garcia Br. at 4. But as the district court observed, "Murphy's testimony that [Parker] never told him about the murder would have been inadmissible collateral evidence under Federal Rule of Evidence 608(b)," making it "fruitless to cross-examine [Parker] about whether he told [] Murphy about the murder, [since] counsel would be stuck with [Parker's] answer." Sp. App'x at 23–24. We therefore agree with the district court that any questioning about that subject would have been a "dead-end," and not a plausible defense strategy.

Finally, Garcia asserts that Murphy gave conflicting accounts of whether Garcia was "a leader or member of the GMGz . . . at the time of the homicide," Garcia Br. at 6, which was a central fact with respect to the murder in aid of racketeering charge. But as the district court correctly noted, Murphy "previously told law enforcement that Mr. Garcia *was* part of the YG GMGz" and that he was responsible for the murder of Joey McClinton – and others. Sp. App'x at 21 n.6 (emphasis added). Such testimony surely would have been "devastating" to

Garcia, and no reasonable attorney – conflicted or unconflicted – would have taken such a chance by calling Murphy to the stand.  App'x at 403.

Accordingly, we find that Garcia has not established that Moskowitz labored under an actual conflict of interest that adversely affected his performance.  He is therefore not entitled to a new trial under Rule 33.

## II.    Sufficient Evidence Supported Garcia's Conviction for Murder in Aid of Racketeering.

Garcia also argues that the evidence at introduced at trial was insufficient to prove murder in aid of racketeering because the government failed to prove that: (1) his gang, the Get Money Gunnaz ("GMGz"), qualified as an "enterprise" on the day McClinton was murdered; and (2) Garcia killed McClinton to maintain or increase his position within the GMGz enterprise.  Again, we disagree.

"We review challenges to the sufficiency of evidence *de novo*, and will uphold a conviction if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Dupree*, 870 F.3d 62, 78 (2d Cir. 2017) (internal quotation marks omitted).  In assessing sufficiency, we "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the [g]overnment's favor, and deferring to the jury's assessment of witness credibility

and its assessment of the weight of the evidence." *United States v. Rosemond*, 841 F.3d 95, 113 (2d Cir. 2016) (internal quotation marks omitted). "A defendant seeking to overturn a conviction on the grounds that the evidence was insufficient bears a heavy burden," *United States v. Vasquez*, 267 F.3d 79, 90 (2d Cir. 2001) (internal quotation marks omitted), as "we must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt," *United States v. Concepcion*, 983 F.2d 369, 382 (2d Cir. 1992).

### A. There Was Sufficient Evidence from Which to Conclude that GMGz Constituted a Racketeering Enterprise at the Time of the McClinton Murder.

A conviction under 18 U.S.C. § 1959 requires the government to prove that (1) "the [o]rganization was a RICO enterprise" as defined in section 18 U.S.C. § 1962; (2) "the enterprise was engaged in racketeering activity as defined in [section 1962]"; (3) the defendant "had a position in the enterprise"; and (4) the defendant committed the crime of violence for the "purpose" of "maintain[ing] or increas[ing] his position in the enterprise." *Id.* at 381. An "association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009); *see also United States v. Arrington*, 941 F.3d 24, 37 (2d Cir. 2019). And a RICO enterprise is defined as "a group of persons

10

associated together for a common purpose of engaging in a course of conduct," proved by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Burden*, 600 F.3d 204, 214 (2d Cir. 2010) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

Viewed in the light most favorable to the government, the trial evidence permitted a rational jury to conclude that the GMGz constituted an "enterprise engaged" in "racketeering activity" that functioned with the requisite "common purpose" at the time of the McClinton murder. *Boyle*, 556 U.S. at 947–48.

Multiple witnesses testified that the GMGz operated as an organized street gang with a clear leadership structure and defined territory, and that it engaged in ongoing narcotics trafficking that it protected through acts of violence. Rayshawn Parker, a GMGz member, testified that Garcia was a "Big Gun," or a "high ranking" gang member, that Joseph Johnson was his "right-hand-man," and that other individuals occupied lower ranks within the organization. App'x 89–90. He testified that higher-ranking members of the gang could bring people into the gang and "send people to do different hits, different shootings and stuff." *Id.* at 90. Parker further testified that the GMGz engaged in ongoing narcotics

trafficking, with members – including Parker – selling crack cocaine within the gang's territory, which he described as north of Field Place and 183rd Street. Importantly, Parker's testimony regarding his activities with the GMGz and the hierarchy of the gang all predated the McClinton murder – he testified that he stopped selling drugs for Garcia and largely disaffiliated with the gang after Garcia killed McClinton.

Parker's testimony was corroborated by Marlon Watson and Paul Spring, both of whom testified that GMGz had an established hierarchy and identified Garcia as the leader of the gang. Spring testified that his friends, who were all members of the GMGz gang, recruited him to join the gang from 2010 to 2018, and that as gang members, they shot "at people, sold drugs, [and committed] different acts of violence." *Id.* at 140. He also testified that his friends told him that GMGz members were expected to "do different violent crimes" such as "shoot[ing] at rival gang members," that he saw GMGz members with guns "every day" from "2010 to 2018," and that he observed them selling drugs "every day." *Id.* at 140–41. And Watson explained that when he joined the GMGz gang in 2010, there were 15–20 members in the gang, Garcia was its leader, and he was aware that other GMGz members sold drugs. *Id.* at 166, 170.

Taken together, this evidence was sufficient for a rational jury to find that GMGz constituted a racketeering enterprise at the time of the McClinton murder.

**B. There Was Sufficient Evidence from Which to Conclude that Garcia Murdered McClinton to Maintain or Increase his Position in the Gang.**

To prove that Garcia committed murder in aid of a racketeering enterprise, the government was required to show that Garcia killed McClinton "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959. While the statute "does not define the phrase 'for the purpose of . . . maintaining or increasing [a defendant's] position in an enterprise,'" we have explained that "on its face, [section] 1959 encompasses violent crimes intended to preserve the defendant's position in the enterprise or to enhance [his] reputation and wealth within that enterprise." *United States v. Pimentel*, 346 F.3d 285, 295 (2d Cir. 2003) (internal quotation marks omitted). And we have routinely held that the motive requirement is satisfied where "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *Id.* at 295–96 (internal quotation marks omitted).

13

Viewing the evidence in the light most favorable to the government, the jury could have inferred beyond a reasonable doubt that Garcia murdered McClinton to maintain his position as the leader of GMGz. *See Concepcion*, 983 F.2d at 382. At trial, Nathaniel McKenzie testified that Garcia told him that he murdered McClinton because "[GMGz and the McClinton family were] warring over drug[] territory." App'x at 240. Watson further testified that GMGz members would "try to harm" rival gang members that were on GMGz-controlled territory. *Id.* at 171. Garcia, in a social media post about a GMGz member who had been imprisoned for shooting a rival gang member, stated: "We play aggressive. You f[***] around and get fired on. All the s[***] we been through just gave us a tighter bond." *Id.* at 173. This evidence amply demonstrates that gang members were expected to engage in violent acts against rival gang members to defend GMGz drug territory – and that Garcia killed McClinton to protect GMGz territory in furtherance of the gang's drug enterprise, and to maintain his position as the gang's leader.

### III. The District Court Properly Allowed Evidence of GMGz Activity That Occurred After 2010.

Garcia next argues that because he was not charged with racketeering conspiracy or substantive racketeering – only murder in aid of racketeering based on conduct that occurred in 2010 – the district court erroneously admitted post-

14

2010 evidence of violence, firearms possession, and gang activity that postdated the murder. We are unpersuaded.

We normally review a district court's evidentiary rulings for abuse of discretion and will disturb a "ruling only where the decision to admit or exclude evidence was manifestly erroneous." *United States v. Williams*, 930 F.3d 44, 58 (2d Cir. 2019) (internal quotation marks omitted). And even if a decision was "manifestly erroneous," we will affirm "if the error was harmless." *United States v. McGinn*, 787 F.3d 116, 127 (2d Cir. 2015) (internal quotation marks omitted). Where a defendant failed to object to the admission of the evidence at trial, however, we review for plain error. *See United States v. Felder*, 993 F.3d 57, 77 (2d Cir. 2021). To demonstrate plain error, Garcia must show that "(1) there is an error; (2) the error is plain, that is, the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 628 F.3d 36, 42 (2d Cir. 2010) (alteration adopted and internal quotation marks omitted).

Garcia contends that the district court erroneously admitted (1) social media posts that postdate October 11, 2010, the date of the McClinton murder, from his account and those of other GMGz members; (2) evidence of uncharged shootings, one of which resulted in the 2013 murder of Kahleed Adams, a GMGz member; and (3) evidence of a 2019 carjacking committed by GMGz members. He argues that the introduction of such "other acts" evidence violated Federal Rules of Evidence 402 and 404 because he was not charged with any racketeering crime between 2011 and 2020 – and that to the extent any of the evidence *was* relevant, it should have been excluded as unduly prejudicial under Rule 403.

But the evidence related to GMGz gang activity was not "evidence of *other* crimes" but rather "evidence of the very crime[s] charged" in the indictment. *United States v. Lyle*, 919 F.3d 716, 736 (2d Cir. 2019). Count Two alleges that Garcia participated in a conspiracy to distribute narcotics with other members of the GMGz from 2010 to June 2021, and Count Five charges Garcia with using, carrying, and possessing firearms in furtherance of the GMGz drug-trafficking conspiracy from 2010 to June 2021. Superseding Indictment at 4–6, *United States v. Garcia*, No. 21-cr-412 (JSR) (S.D.N.Y. Feb. 16, 2023), Dkt. No. 266; Appellee Br. at 47.

Accordingly, evidence from that time period related to the crimes charged in Counts Two and Five as it demonstrated GMGz's membership structure, its access to large amounts of cash, its acts of violence to protect the gang's operation, and, additionally, its members' use of firearms. *See United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) ("Where, as in this case, the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself." (internal quotation marks omitted)).

Nor was the probative value of this evidence "substantially outweighed" by its prejudicial effect. Fed. R. Evid. 403. Rule 403 allows a district court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." But evidence is generally not unfairly prejudicial when it does not involve conduct more inflammatory than the charged crime. *See United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). In this case, the challenged evidence had significant probative value because it was admissible as direct evidence of the conspiracy itself. *See Diaz*, 176 F.3d at 79. Considering the evidence in context, we cannot say that the district court abused its broad discretion in admitting evidence of GMGz's existence and activities between 2011 and 2020.

**IV.** **The District Court Properly Denied Garcia's Request to Present a Surrebuttal Case.**

Finally, Garcia asserts that he was denied his "right to present a meaningful defense" when the district court denied his request to present a surrebuttal case. Garcia Br. at 53. We disagree.

We review a trial court's decision to deny a party's request to present surrebuttal evidence for abuse of discretion. *United States v. Murray*, 736 F.3d 652, 656 (2d Cir. 2013). "Surrebuttal is merited where (1) the government's rebuttal testimony raises a new issue, which broadens the scope of the government's case, and (2) the defense's proffered surrebuttal testimony is not tangential, but capable of discrediting the essence of the government's rebuttal testimony." *Id.* at 657 (internal quotation marks omitted). Garcia's proffered surrebuttal evidence satisfied neither of these requirements.

First, the government's rebuttal evidence – two recorded calls between GMGz member Joseph Johnson and Garcia's sister, Elia Garcia – did not "broaden the scope" of its case; it merely corroborated McKenzie's testimony that Garcia, fearing that Johnson might cooperate, had asked his sister, who was in a romantic relationship with Johnson, to ensure that he would not "snitch." App'x at 304. Those calls addressed the same subject matter as McKenzie's earlier testimony and

were offered solely to rebut the defense's attacks on his credibility. The rebuttal evidence merely corroborated testimony already before the jury and did not introduce a new issue warranting surrebuttal.

Second, the additional recordings of calls between Johnson and Elia Garcia were purely tangential. While Garcia argues that those additional recordings would demonstrate the nature and longevity of the pair's romantic relationship, there was no dispute that a romantic relationship existed between Johnson and Elia Garcia. Indeed, McKenzie repeatedly referred to Johnson as Garcia's "sister's boyfriend" during his testimony. App'x at 240, 247, 264–69. Thus, the recordings would not have discredited "the essence of the government's rebuttal testimony." *Murray*, 736 F.3d at 657 (internal quotation marks omitted).

Finally, Garcia insists that the district court should have allowed him to recall McKenzie as a surrebuttal witness. But McKenzie neither participated in nor heard the calls between Johnson and Elia Garcia, and he did not know either of the participants. Consequently, McKenzie could not have shed any light on the government's rebuttal evidence. And to the extent that Garcia intended to re-examine McKenzie on the fact that he had shared a cell with Garcia for "two and a half months," App'x at 285, his attorney had already extensively cross-examined

McKenzie on that subject, *see id.* at 263, and the parties had stipulated that an MDC staff attorney, if called to testify, would "state that Mr. Garcia and Mr. McKenzie were housed in the same cell from March 14, 2022 to March 24, 2022" but "housed in different cells on the same housing unit from March 24, 2022 to June 8, 2022," *id.* at 287. It was not an abuse of discretion for the district court to deny Garcia a second bite at the apple on a subject that had nothing to do with the government's rebuttal evidence and that was satisfactorily covered during cross-examination.

\* \* \*

We have considered Garcia's remaining arguments and conclude that they are without merit. Accordingly, we **AFFIRM** the judgments of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court.

20